## MICHIGAN *v.* WISCONSIN.

### IN EQUITY.

No. 19, Original.  Argued January 5, 1926.—Decided March 1, 1926.

1. Long acquiescence by one State in the possession of territory, and in the exercise of sovereignty and dominion over it, by another

State, is conclusive of the latter's title and rightful authority. Pp. 308, 313, 316.

2. Where part of the boundary between two States was described in the enabling act of the one senior in time of admission, as the center of the main channel of a river, but, in the enabling act and act of admission of the junior State, as the river, with specific provision that the line be so run as to include within the jurisdiction of that State all the islands in a designated stretch of the river, *held* that the two acts last mentioned gave the junior State color of title so that her original and long continued possession of, and assertion and exercise of dominion and jurisdiction over, most of the islands on the other side of the channel extended her adverse possession to all of them, in the absence of ·actual possession of, or exercise of dominion over, any part of the included territory by the other State, the area within the described boundary, both land and water, being considered as together constituting a ʼsingle tract of territory.   P. 313.

3. The controversy in this suit involved portions of the boundary between Michigan and Wisconsin extending from Lake Superior via the Montreal River, Lake of the Desert, and Menominee River to Green Bay, and thence through the center of the most usual ship channel to the center of Lake Michigan.   From the evidence sum-· marized in the opinion the Court concludes:

(1) That the description in the enabling act under which Michigan was admitted as a State in 1837, of a line from the mouth of the Montreal River to the Lake of the Desert, was inserted under the mistaken belief that the river connected with the lake; that this mistake was discovered as early as 1841, of which discovery Michigan, long prior to the admission of Wisconsin, had knowledge; that the line, as claimed by Wisconsin, which pursues the easterly branch of the river (instead of the westerly, now claimed by Michigan as the one originally intended,) and which runs from a monument at the head of that branch in a direct course to the Lake of the Desert, was surveyed and marked by Government surveyors, in 1841 and 1847; that Michigan not only assented to the result of these surveys, but actively participated in securing the insertion of the description of that line in the Wisconsin Enabling Act and herself substantially adopted it by her Constitution of 1850; that for a period of more than 60 years she stood by without objection with full knowledge of the possession, acts of dominion, and claim and exercise of jurisdiction on the part of Wisconsin over the area in question; that, in addition, the line as claimed by Wisconsin has been, from the time of the survey of 1847, accepted as the true

one by the United States and, in its surveys, plats and maps, sales and other acts in respect of the public lands, continuously and consistently recognized, with the knowledge of Michigan and without protest on her part; that there is no merit in the contention of Michigan that she labored under an excusable mistake; and that the territory between the two opposing lines belongs to Wisconsin in view of her long continued possession, etc., acquiesced in by Michigan. P. 301.

(2) That, upon like considerations, where the line was described in the Michigan Enabling Act as running through the fork of the Menominee River whose head waters were nearest in direct line to the Lake of the Desert and down the center of the main channel of the Menominee to Green Bay, and in the Wisconsin Enabling Act as running from Lake Brulé, along its southern shore to Brulé River, thence down that river to the Menominee, and down the main channel of the Menominee to its mouth, with specific directions that the line be so run as to include within Michigan all the islands in the Brulé and the Menominee down to and inclusive of Quinnesec Falls, and within Wisconsin all the islands in that river between those falls and its junction with Green Bay,— the boundary, as fixed and established by long acquiescence, follows the channels of the Brulé and Menominee rivers wherever they are free from islands, but wherever islands are encountered above the Quinnesec Falls, it follows the channel· nearest the Wisconsin mainland, so as to throw all such islands into Michigan; and, wherever islands are encountered below those falls, it follows the channel nearest the Michigan mainland, so as to throw all such islands into Wisconsin. P. 308.

.(3) That, upon like considerations, the boundary through Green Bay to Lake Michigan, (described in both enabling acts as " the most usual ship channel,") is not the channel claimed by Michigan, which runs easterly across the bay to near the westerly shore of Door County peninsular, and thence northerly and through Death's Door Channel to the lake, but the channel claimed by Wisconsin, which goes north from the Menominee to a point opposite Rock Island Passage, and through that passage to the lake,—the title of Wisconsin to the disputed area being established by long possession of and dominion over the included islands, acquiesced in by Michigan. P. 314.

4. In a boundary suit between States; the costs are generally to be divided. P. 319.

Bill dismissed.

Suit brought in this Court by Michigan against Wisconsin to determine boundary questions.

*Mr. Meredith P. Sawyer,* with whom *Messrs. Andrew B. Dougherty,* Attorney General of Michigan, and *Carl D. Mosier,* Assistant Attorney General, were on the brief, for complainant.

*Mr. R. M. Rieser,* with whom *Messrs. Herman L. Ekern,* Attorney General of Wisconsin, and *Emmert L. Wingert* were on the brief, for defendant.

Mr. Justice Sutherland delivered the opinion of the Court.

This is an original suit in equity brought in this court to determine the boundary between the states of Michigan and Wisconsin from the mouth of the Montreal River at Lake Superior to the ship channel entrance from Lake Michigan into Green Bay. By the Enabling Act of June 15, 1836, c. 99, 5 Stat. 49, under which Michigan became a state in 1837, c. 6, 5 Stat. 144, this boundary is described as follows:

". . . thence [the mouth of the Montreal River] through the middle of the main channel of the said River Montreal, to the middle of the Lake of the Desert; thence, in a direct line to the nearest head water of the Menominee River; thence, through the middle of that fork of the said river first touched by the said line, to the main channel of the said Menominee River; thence, down the centre of the main channel of the same, to the centre of the most usual ship channel of the Green Bay of Lake Michigan; thence, through the centre of the most usual ship channel of the said bay to the middle of Lake Michigan; . . ."

The Territory of Wisconsin was created by an act of April 20, 1836, c. 54, 5 Stat. 10, 11, and this boundary is there described in the reverse direction:

".  .  .  to a point in the middle of said lake [Michigan], and opposite the main channel of Green Bay, and through said channel and Green Bay to the mouth of the Menominee River; thence through the middle of the main channel of said river, to that head of said river nearest to the Lake of the Desert; thence in a direct line, to the middle of said lake; thence through the middle of the main channel of the Montreal River, to its mouth;  .  .  ."

The only difference between the two descriptions is that in the former the call is for the "most usual ship channel," while in the latter it is for the "main channel," of Green Bay.  In the Wisconsin Enabling Act of August 6, 1846, c. 89, 9 Stat. 56–57, under which the state was admitted by the Act of May 29, 1848, c. 50, 9 Stat. 233, this boundary is described as

".  .  .  running with the boundary line of the State of Michigan, through Lake Michigan, Green Bay, to the mouth of the Menominee River; thence up the channel of said river to the Brulé River; thence up said last mentioned river to Lake Brulé; thence along the southern shore of Lake Brulé in a direct line to the centre of the channel between Middle and South Islands, in the Lake of the Desert; thence in a direct line to the head-waters of the Montreal River, as marked upon the survey made by Captain Cramm; thence down the main channel of the Montreal River to the middle of Lake Superior;  .  .  .

".  .  .  That, to prevent all disputes in reference to the jurisdiction of islands in the said Brulé and Menominee Rivers, the line be so run as to include within the jurisdiction of Michigan all the islands in the Brulé and Menominee Rivers, (to the extent in which said rivers are adopted as a boundary,) down to, and inclusive of, the Quinnesec Falls of the Menominee; and from thence the line shall be so run as to include within the jurisdiction of Wisconsin all of the islands in the Menominee River, from the falls aforesaid down to the junction of said river

with Green Bay: *Provided,* That the adjustment of boundary, as fixed in this act, between Wisconsin and Michigan shall not be binding on Congress, unless the same shall be ratified by the State of Michigan on or before the first day of June, one thousand eight hundred and forty-eight."

The history of events leading up to the present controversy extends over a period of eighty years, and the evidence, including a multitude of official and other maps and documents, constitutes a long and involved record. The case is reviewed in voluminous but well prepared briefs, and was helpfully argued at the bar. This mass of material we have examined with the care properly due the importance of the issue and the high character of the parties litigant; but much of it may be put aside as unnecessary for final consideration, since the determination we have reached depends upon a comparatively few decisive facts and circumstances, either undisputed or clearly established.

In the briefs and oral arguments the boundary is divided for purposes of convenient discussion into three distinct sections, namely: (1) the Montreal River section, extending from the mouth of the Montreal River to the Lake of the Desert and thence to the head-waters of the Menominee River (or to Lake Brulé); (2) the Menominee River section, extending from its head-waters (or from Lake Brulé) to Green Bay; and (3) the Green Bay section, extending from the last named point through the center of the most usual ship channel of the Green Bay to Lake Michigan. Although our ultimate determination in respect of these three sections rests upon the same basic principle, they are so distinct in their physical characteristics and in respect of much of the evidence peculiarly applicable to each apart from the others, that our conclusions will be more clearly formulated and better understood if we adopt the same plan in the examination of the questions which follows.

## The Montreal River Section.

If we had before us nothing but the language of the Michigan Enabling Act, describing this section of the boundary as extending "through the middle of the main channel of the said river Montreal, to the middle of the Lake of the Desert," it would not be easy to avoid the conclusion that it was the understanding of the framers of the act that the river Montreal could be followed to a connection with the Lake of the Desert. And that such was the understanding clearly appears from the record. Moreover, maps in existence at the time of the passage of the act, which were available and must have been known to the framers, depict the Lake of the Desert (or, as it is there called, *Lac Vieux Desert*) as the source of the Montreal River. But the locality at that time was a wilderness, the topography of which was practically unknown except to the aboriginal inhabitants and the occasional *voyageur*, trapper and hunter; and, following the date of the passage of the act, it was found that, in fact, the head-waters of the Montreal did not extend to the Lake of the Desert, but fell short of it some fifty or sixty miles. It was subsequently revealed by exploration and surveys that the river from its mouth follows a winding course for several miles eastwardly and then divides into two branches, the westerly branch to its head following a southerly direction and the easterly branch a southeasterly direction. The westerly branch finds its source in a body of water called Island Lake. The easterly branch finally divides into two small tributaries, called, respectively, the Balsam and Pine. The lake, which, in our opinion is sufficiently identified as the one which Congress meant by its call for the Lake of the Desert, is several miles nearer to the point of junction of these tributaries than it is to any point on the westerly branch. Much evidence was submitted on behalf of Michigan in an effort

to demonstrate that the westerly branch of the river was the larger stream and was in fact, and was understood by Congress to be, the upper portion of that river, and that Island Lake at the head of the westerly branch was intended by the designation " Lake of the Desert." We think it fairly appears, to the contrary, that the easterly, and not the westerly, branch was, and was understood to be, the upper portion of the Montreal, but a positive conclusion to that effect is not necessary, since our judgment turns upon other and independent considerations.

In 1838, an act of Congress, c. 101, 5 Stat. 244, directed that the boundary line in question be " surveyed, marked, and designated," and by a later act, approved July 20, 1840, c. 54, 5 Stat. 404, 407, the making of the survey was placed under the superintendence of the War Department. Pursuant to this legislation, one Captain Cram was directed to make the survey, which he proceeded to do, completing it in 1841. He submitted two reports to Congress, from which it appears that the description of the boundary " through the middle of the main channel of the said river Montreal, to the middle of the Lake of the Desert " was an impossible one, and that the line could not be run in complete accordance with it. Carrying out as nearly as possible what he conceived to be the intention of Congress, he fixed the head-waters of the Montreal at the junction of the Balsam and Pine, at a point designated and marked "Astronomical Station No. 2," from which point the line was extended in a direct course to the Lake of the Desert. His reports embodied data for the information of Congress and recommended that action be taken by that body definitely to establish the boundary.

Captain Cram's first report is dated December, 1840. He begins it with an analysis of the description we have quoted from the Michigan Enabling Act, from which he infers, that Congress supposed that the Lake of the Desert

discharged itself into the Montreal River; that somewhere between Lake Superior and Green Bay there was a known lake bearing that name, since the description is "to the middle of the Lake of the Desert"; that of the various head-waters discharging into the Menominee River one would be found nearest to the Lake of the Desert, since that is the call; and that this would be found to be a branch of the Menominee, and not a lake, since the description is, "through the middle of that *fork* . . . first touched by the said line."

Following these inferences, he states that the Lake of the Desert has no connection either with the Montreal River or with the Menominee, but constitutes the principal head of the Wisconsin River. His conclusion is that additional action on the part of Congress will be required to the end that the boundary may be defined "in such a manner that it can be established either upon the ground or laid down on a map with that degree of definiteness which should always characterize a boundary line between two states."

On January 12, 1841, the Governor of Michigan addressed a special message to the state Legislature in which he stated that a strict adherence to the terms of the Michigan Enabling Act defining the boundary in question, according to information recently communicated to him by the state geologist, would seem to be "absolutely impracticable." With the message was transmitted the communication referred to, together with a sketch of the country which the Governor thought would present with sufficient certainty the disagreements between the description contained in the enabling act and the actual geography of the region. Thereupon, the Legislature— evidently with Captain Cram's report before it, since the bill avers that action was taken "relying on the representations made in said report as to the impossibility of locating said boundary in accordance with the [Michigan

Enabling Act]"—adopted a joint resolution, reciting that from a critical examination of the country it appeared that a strict and literal conformity with the description was impossible and that presumptively the general intent could be attained without much difficulty if the line be immediately marked and described, and requesting Congress to cause the boundary in question to be surveyed and marked and a commissioner appointed to act with a state commissioner to the end that the boundary be established in conformity with the manifest general intent of the act. The state delegation in Congress was requested by the resolution to endeavor to secure congressional action to effect this object.

In 1842, and again in 1843, a bill was introduced in the United States Senate by a Michigan senator to amend the Michigan Enabling Act so as to make the disputed boundary conform substantially to the line as it was subsequently defined in the Wisconsin Enabling Act, including that portion relating to the division of the islands in the Brulé and Menominee rivers. These bills failed, apparently for parliamentary reasons and not because there was any substantive objection to them. Then followed the Wisconsin Enabling Act of 1846, the pertinent words of which we have quoted. The provision of this act describing the boundary now in question, and providing for a division of the islands in the Brulé and Menominee, was submitted in the House by a Michigan congressman, with the statement that it had been agreed upon between the members from Michigan and the Wisconsin delegate. Shortly thereafter, Congress directed a survey of "so much of the line between Michigan and Wisconsin as lies between the source of Brulé River and the source of Montreal River, as defined by the [Wisconsin Enabling Act]," c. 175, § 4, 9 Stat. 85, 97; and in pursuance thereof a survey was made by William A. Burt, in 1847. Burt's line, which was marked with posts set at

half-mile intervals and otherwise identified, substantially followed Cram's recommendation and is the line now claimed by Wisconsin.

It does not appear that Michigan acted affirmatively in respect of the proviso that the adjustment of boundaries as fixed in the Wisconsin Enabling Act should not be binding on Congress unless the same should be ratified by Michigan on or before June 1, 1848. Nevertheless, Wisconsin was admitted by the Act of May 29, 1848, *supra,* with the express provision that its boundaries should be as prescribed by the Enabling Act of 1846.

But, while Michigan did not in terms ratify the proviso just mentioned, there was inserted in her constitution of 1850, and ratified by the people, the following description of the boundary in question:

"   .   .   . to the mouth of the Montreal River; thence through the middle of the main channel of the said River Montreal to the head waters thereof; thence in a direct line to the center of the channel between Middle and South Islands in the Lake of the Desert; thence in a direct line to the southern shore of Lake Brulé; thence along said southern shore and down the River Brulé to the main channel of the Menominee River; thence down the center of the main channel of the same to the center of the most usual ship channel of the Green Bay of Lake Michigan; thence through the center of the most usual ship channel of the said Bay to the middle of Lake Michigan;   .   .  ." 1915 Comp. L. Mich. 133, 134.

This description was adopted by the constitutional convention held in 1867, with the addition of the words found in the Wisconsin Enabling Act: "as marked upon the survey made by Captain Cram." The same description, including the reference to the Cram survey, was again re-adopted by the Michigan special constitutional commission of 1873. The proceedings of both the convention and the commission show that these re-adoptions were

made deliberately and with full understanding.  Both proposed constitutions, however, were rejected by the people, but apparently for reasons having no relation to the question of boundaries.  Thus the matter rested until 1908, in which year a new and amended constitution was adopted, containing a radically different description of the boundary in question, namely:

" . . . thence in a direct line through Lake Superior to the mouth of the Montreal River; thence through the middle of the main channel of the westerly branch of the Montreal River to *Island Lake,* the head waters thereof; thence in a direct line to the center of the channel between Middle and South Islands in the Lake of the Desert; thence in a direct line to the southern shore of Lake Brulé; . . ."  1915 Comp. L. Mich. 209, 210.

By this description for the first time the westerly branch of the Montreal was brought in and the line carried through the main channel thereof to Island Lake.  During the same year, the Attorney-General of the State was directed by the state Legislature to investigate and institute proceedings to secure a determination of the correct boundary.  The investigation was made and reported; and again the matter rested until 1919, at which time the state Legislature provided for the appointment of a commission to investigate the " disputed " boundary line.  This commission made a report in 1921 and was continued by an act of the Legislature passed the same year.  The bill was filed in this court on October 8, 1923.

When admitted to statehood, Wisconsin was, and ever since has continued to be, in possession of the area in dispute, that is to say, of all lands within the boundary which she now claims.  As early as 1850, county government was established upon the basis of this boundary.  In 1874, taxes were assessed and collected by Wisconsin, and by 1886, practically the entire area had been subjected to such taxation.  During this time, towns were

built, highways constructed, public buildings erected, elections held, Wisconsin law enforced, and other customary acts of dominion and jurisdiction exercised by that state within the disputed area.

From the foregoing facts and circumstances the conclusions are inevitable: that the description in the Michigan Enabling Act of the line from the mouth of the Montreal to the Lake of the Desert was inserted under the mistaken belief that the river connected with the lake; that this mistake was discovered as early as 1841, of which discovery Michigan, long prior to the admission of Wisconsin, had knowledge; that the line as now claimed by Wisconsin was surveyed and marked by Cram and Burt at the dates already stated; that Michigan not only assented to the result of these surveys, but actively participated in securing the insertion of the description of that line in the Wisconsin Enabling Act and herself substantially adopted it by the Constitution of 1850; and that for a period of more than 60 years she stood by without objection with full knowledge of the possession, acts of dominion, and claim and exercise of jurisdiction on the part of the State of Wisconsin over the area in question.

In addition to this, the line as claimed by Wisconsin has been, from the time of the Burt survey, accepted as the true boundary by the United States and, in its surveys, plats and maps, sales and other acts in respect of the public lands, continuously and consistently recognized, with the knowledge of Michigan and without protest on her part. Indeed, nothing appears to indicate dissatisfaction with the boundary thus established until the adoption of the Constitution of 1908, and, even then, except to the extent that this may be regarded as a continuing assertion of a claim to the boundary as there set forth or as originally described in the Michigan Enabling Act, the matter was allowed to rest until 1919.

To meet this situation, it is contended that the State of Michigan through all these years labored under a mistake

in respect of the real facts and that this was the result of excusable ignorance on her part. The contention is devoid of merit. The material facts, since at least the date of the Wisconsin Enabling Act, have been so obvious that knowledge of them on the part of the Michigan authorities, if it were not shown, as it is shown, by the evidence, must necessarily be assumed.

Notwithstanding, the State of Michigan at this late day insists that the boundary now be established by a decree of this court in accordance with the description contained in her Constitution of 1908. Plainly, this cannot be done. That rights of the character here claimed may be acquired on the one hand and lost on the other by open, long-continued and uninterrupted possession of territory, is a doctrine not confined to individuals but applicable to sovereign nations as well, *Direct United States Cable Co.* v. *Anglo-American Telegraph Co.,* [1877] L. R. 2 A. C. 394, 421; Wheaton, International Law, 5th Eng. Ed. 268–269; 1 Moore, International Law Digest, 294 *et seq.,* and, *a fortiori,* to the quasi-sovereign states of the Union. The rule, long-settled and never doubted by this court, is that long acquiescence by one state in the possession of territory by another and in the exercise of sovereignty and dominion over it is conclusive of the latter's title and rightful authority. *Indiana* v. *Kentucky,* 136 U. S. 479, 509, *et seq.; Virginia* v. *Tennessee,* 148 U. S. 503, 522–524; *Louisiana* v. *Mississippi,* 202 U. S. 1, 53; *Maryland* v. *West Virginia,* 217 U. S. 1, 40–44; *Rhode Island* v. *Massachusetts,* 4 How. 591, 639; *Missouri* v. *Iowa,* 7 How. 660, 677; *New Mexico* v. *Colorado,* 267 U. S. 30, 40–41. That rule is applicable here and is decisive of the question in respect of the Montreal River section of the boundary in favor of Wisconsin.

### The Menominee River Section.

The description in the Michigan Enabling Act of this section of the boundary begins at the head waters of the

Menominee River nearest to the Lake of the Desert in a direct line,

" thence, through the middle of that fork of the said river first touched by the said line, to the main channel of the said Menominee River; thence, down the centre of the main channel of the same, to the centre of the most usual ship channel of the Green Bay."

The description in the act creating the Territory of Wisconsin is the same, but in the opposite direction:

" . . . thence through the middle of the main channel of said [Menominee] river, to that head of said river nearest to the Lake of the Desert; thence in a direct line to the middle of said lake; . . ."

But the description in the Wisconsin Enabling Act contains important differences:

" . . . thence up the channel of said [Menominee] river to the Brulé River; thence up said last mentioned river to Lake Brulé; thence along the southern shore of Lake Brulé in a direct line to the centre of the channel between Middle and South Islands in the Lake of the Desert; . . ." or, stated in the order of the Michigan act: From the center of the channel between Middle and South Islands in the Lake of the Desert in a direct line to the southern shore of Lake Brulé; thence along the southern shore of Lake Brulé to the Brulé River; thence down the Brulé River to the Menominee; thence down the channel of the Menominee to its mouth.

The evidence shows that Lake Brulé is not the head of the Menominee nearest to the Lake of the Desert, as called for by the Michigan Enabling Act, though the Brulé River is the principal tributary of the Menominee; and the inference is pretty clear that the change of description was made in the Wisconsin Enabling Act as a part of a general readjustment of the boundary. At any rate, since this part of the line is not in controversy, we need not consider the matter except as it may reflect light

upon the effect of, and the question of Michigan's acquiescence in, the further provision, that, to prevent disputes as to jurisdiction, the line shall be so run as to include within the jurisdiction of Michigan all islands in the Brulé and Menominee down to and including the Quinnesec Falls of the Menominee, and thence so as to include within the jurisdiction of Wisconsin all islands in the Menominee below the falls. As to this part of the line, the contention of Wisconsin is that the description in the Wisconsin Enabling Act was in effect, a proposed adjustment of the boundary as an undividable unit, and that Michigan, by the Constitution of 1850, having expressly adopted that part of the line from the Lake of the Desert to Lake Brulé, cannot be heard to say that she did not also adopt the adjustment of the line in respect of a division of the islands. There is force in this contention, and especially so in view of the fact that the change from the nearest head-water of the Menominee to Lake Brulé operated to give Michigan additional territory. To permit her to reap the benefit of the adjustment so far as it is to her advantage and reject it to the extent that it is advantageous to her sister state would be plainly inequitable. We prefer, however, to rest our determination upon the conclusion, fully justified by the record, that,— whatever were the rights of the respective states in respect of the islands in question immediately upon the adoption of the Constitution of 1850,—Wisconsin, for a period of more than half a century following that time, had the undisputed and undisturbed possession of substantially all of the islands in the river below the Quinnesec Falls, and, without reference to the main channel of the river, exercised jurisdiction and dominion over them with the knowledge and acquiescence of the complainant.

Captain Cram's first report to Congress, dated December, 1840, points out the impracticability of following the center of the main channel of the river:

"The 'center' of the main channel of the Menominee River is made a part of the boundary. The River contains numerous islands, and consequently more than one channel, where these islands occur. It will be impossible in many of these cases to know which is the 'main channel' without minute surveys. In many cases it was tried and found impossible to decide by a simple inspection or reconnaissance which was the 'main channel.' It should also be remarked here that the term 'main channel' applied to the multiplicity of channels of the Menominee, would be somewhat ambiguous in any event—for, it may be asked—Is the main channel the widest channel of the river? Or is it the deepest? If it is the widest or deepest now, will it be the widest or deepest hereafter? Or shall the main channel be that through which the greater quantity of water shall be found to pass at the time of the survey? And if it should occur that two channels at the same island pass equal quantities of water—which would then be regarded as the boundary? These questions are sufficient to show the indefiniteness of the term 'Main Channel'—There are also a few islands in the Brulé River to which similar questions might apply in reference to the term 'Main Channel.'

"To avoid all ambiguity in reference to these channels, it might be specified in the act defining the boundary, that in ascending the stream, the boundary shall follow the extreme left hand channel of the Brulé and the extreme right hand channel of the Menominee down to a well known point of the river—say Pe-me-ne Falls; and thence to follow the extreme left hand channel of the remainder of the Menominee to its mouth. Such a division would leave most of the islands in Michigan and the remainder in Wisconsin, and would avoid much expense in minute surveys to ascertain the 'main channel' and would leave no indefiniteness upon this part of the boundary. The free use of either channel for the purposes of naviga-

tion would, from an established principle of law, be open at all times to the citizens of either state, and the islands would be nearly distributed in equal proportions between the two states."

Following the date of this report in respect of the impossibility—or extreme difficulty practically amounting to that—of locating the boundary in accordance with the provisions of the Michigan Enabling Act, and, it fairly may be assumed, with a view of effectuating Captain Cram's recommendation, the Michigan Legislature passed the resolution already referred to, calling upon Congress to cause the boundary to be surveyed and marked in conformity with the manifest general intent of the Michigan Enabling Act, and requesting the delegation of the state in Congress to use their efforts to secure such action. This was followed, as already stated, by the introduction of the bills in the Senate and the subsequent insertion, by agreement between the members of Congress from Michigan and the Wisconsin delegate, of the provision in the Wisconsin Enabling Act dividing the islands in accordance with Captain Cram's suggestion, except in a particular not important here.

In 1854, the survey of all of the islands below Quinnesec Falls as a part of Wisconsin, was directed by the United States Surveyor General for Wisconsin, and such survey was immediately begun and thereafter continuously prosecuted. The evidence, in our opinion, fairly shows that, as early as 1879, the greater part in area of all of them had been thus surveyed and platted as belonging to Wisconsin, including many which would fall on what Michigan claims is the Michigan side of the main channel. On behalf of Michigan, it is strongly contended that to this there are important exceptions. But, without going into details, it is enough to say that the clear weight of the evidence is to the contrary. It is true that so-called Island No. 8, or Merryman's Island, was surveyed as in

both states; that the Wisconsin survey was subsequently cancelled; and that, thereafter, exclusive jurisdiction over the tract of land constituting it was exercised by Michigan. It is said that, nevertheless, the "island" is now claimed by Wisconsin; but, on the contrary, Wisconsin concedes that it belongs to Michigan. The fact is that the tract was originally considered to be an island and, consequently, surveyed as a part of Wisconsin. Upon further investigation, it was found by the United States Surveyor not to be an island, but, in reality, a part of the Michigan mainland. The Wisconsin survey was, accordingly, cancelled and the title of Michigan thereafter fully conceded. Two other so-called islands of small area in the same vicinity are in like situation.

Some of these islands, comparatively small in area and of little consequence, have never been surveyed or any definite acts of dominion exercised over them by either state. But to this we attach no importance. The assertion and exercise of dominion by Wisconsin over the islands on the Michigan side of the channel was begun and has continued in virtue of, and in reliance upon, the readjustment of the boundary set forth in the Wisconsin Enabling Act. The rule is well-settled in respect of individual claimants that actual possession of a part of a tract by one who claims the larger tract, under color of title describing it, extends his possession to the entire tract in the absence of actual adverse possession of some part of it by another. *Clarke's Lessee* v. *Courtney,* 5 Pet. 319, 354; *Hunnicutt* v. *Peyton,* 102 U. S. 333, 368; *Ellicott* v. *Pearl,* 10 Pet. 412, 442; *Smith* v. *Gale,* 144 U. S. 509, 525–526; *Montoya* v. *Gonzales,* 232 U. S. 375, 377; *Houston Oil Co. of Texas* v. *Goodrich,* 213 Fed. 136, 142. Upon like grounds and with equal reason, under circumstances such as are here disclosed, the principle of the rule applies where states are the rival claimants. It results that the Wisconsin Enabling Act, together with the Act

of Admission, gave color of title in that state to all of the islands within the limits there described; and that her original and continued possession, assertion and exercise of dominion and jurisdiction over a part of these islands, pursuant to such legislation and with the acquiescence of Michigan, extended Wisconsin's possession, dominion and jurisdiction to all of them, in the absence of actual possession of, or exercise of dominion over, any territory within the boundary by Michigan. The fact that the islands constitute separated tracts of land is of no consequence here, whatever its effect might be under other conditions. In applying the rule, the area within the described boundary, both land and water, must be considered as together constituting a single tract of territory.

We, therefore, hold, as to this section of the boundary, that from Lake Brulé to the mouth of the Menominee the line, which is now fixed and finally established by long acquiescence, follows the channels of the Brulé and Menominee wherever they are free from islands; that wherever islands are encountered above the Quinnesec Falls the line follows the channel nearest the Wisconsin mainland, so as to throw all such islands into Michigan; and that wherever islands are encountered below the Quinnesec Falls the line follows the channel nearest the Michigan mainland, so as to throw all such islands into Wisconsin.

### The Green Bay Section.

In determining the boundary through this section, the question is not embarrassed by differences of description. The calls of the Michigan Enabling Act are down the channel of the Menominee to " the centre of the most usual ship channel of the Green Bay of Lake Michigan; thence through the centre of the most usual ship channel of the said Bay to the middle of Lake Michigan." The Wisconsin Enabling Act calls for the same boundary.

The evidence shows that there are two distinct ship channels, to either of which this description might apply. From the mouth of the Menominee, the channel, according to the Michigan claim, proceeds across the waters of Green Bay in an easterly direction until near the westerly shore of the Door County peninsula; thence, in close proximity to the shore, in a northerly direction to a point opposite Death's Door Channel (or *Porte dès Morts*); thence through that channel into Lake Michigan. The channel claimed by Wisconsin, after leaving the mouth of the Menominee, turns to the north and pursues a northerly direction to a point opposite the Rock Island passage which lies between Rock Island and St. Martin's Island; thence through the Rock Island passage into Lake Michigan. The territory in dispute lies between these rival channels, and embraces two groups of islands: (1) Chambers Island, the Strawberry Islands, and a few others, small and unnamed, all within the main waters of Green Bay west of the Door County peninsula; and (2) Rock, Washington, Detroit and Plum islands, lying between Death's Door Channel and the Rock Island passage, at the north end of the peninsula. The evidence as to which of the two ship channels was the usual one at the time of the adoption of the Michigan Enabling Act is not only conflicting, but of such inconclusive character that, standing alone, we could base no decree upon it with any feeling of certainty. Living witnesses are no longer available; and tradition, recollection of statements made by persons long since dead—if of any legitimate value—, deductions drawn from ancient documents. more or less cryptic, and inferences based on more recent uses of the channels or on their relative safety and conven. nce as indicated by physical characteristics, all relied upon in the absence of first-hand evidence, constitute at best most unsatisfactory substitutes. If it were necessary, we should, of course, undertake the task—as we should be

bound to do—of reaching a conclusion from these dubious premises. But, it is not necessary, for, as in the case of the two sections of the boundary just discussed, the title of Wisconsin to the disputed area now in question, is established by long possession and acquiescence; and this conclusion is justified by evidence and concessions of the most substantial character.

There is evidence of acts of dominion and possession of some of the disputed islands while Wisconsin was yet a territory. Almost from the day of her admission, the state has continuously possessed, asserted title and exercised jurisdiction and dominion over all of the islands within the boundary claimed by her. In support of this general statement, the following, among other things, may be cited: On March 21, 1855, Washington, Detroit, Rock and Plum islands, described as being in the waters of Green Bay in Door County, were organized by an act of the Wisconsin Legislature as the town of Washington. Ch. 210, Laws of Wisconsin, 1855. A census taken the same year by the town clerk showed a population of 318, which has since grown, it is said, to about 1000. Since before that time, the United States Land Department, by its surveys, plats and sales of public lands, has uniformly and notoriously recognized the islands as a part of Wisconsin, without objection on the part of Michigan. Indeed, as early as 1837, they were surveyed and platted as a part of Wisconsin Territory. A large number of maps published and available to the public during the years between 1837 and 1878, without exception, show the islands as a part of Wisconsin; and during the same time they do not appear in any survey or upon any map as belonging to Michigan. Never, so far as we are able to find from the record, have they been recognized in any practical way as a part of Michigan or, prior to the commencement of this suit, claimed by that state.

The evidence in respect of the other group of islands, while perhaps not so complete, is definite and clear to the

same effect.  The taxation of lands on Chambers Island began while Wisconsin was still a territory.  In 1861, voters on that island participated in a Wisconsin election. A history of Door County, introduced by complainant, recites that the island constituted an organized town forming a part of Door County, Wisconsin, as early as 1867.  Evidence of early and continued recognition and treatment of the island as a part of Wisconsin by the United States through its surveys, etc., is to the same effect as that in respect of the other group.  And the evidence is likewise the same in respect of the uniform appearance of Chambers Island and the other small islands of the group upon the old maps as a part of Wisconsin, and their absence from Michigan surveys and maps.  The absence of evidence of specific acts of dominion over the Strawberry and the other small islands of this group is easily understood and does not affect the result.  They are of little consequence, lying well within the boundary as claimed by Wisconsin, easterly from Chambers Island and near the westerly shore of the Door County peninsula. They appear on all maps as, and have never been regarded or treated otherwise than, a part of Door County.  It is impossible to give them a status differing from that of the larger island and the peninsula, between, and within the shadows of, which they lie.

That Wisconsin since statehood has continuously asserted title and has exercised complete and exclusive dominion over all the islands of both groups is really not a serious issue.  Indeed, the bill of complaint avers that Wisconsin has possessed herself of, and exercised sovereignty over, the islands, including Washington, Plum, the Strawberries, and numerous other valuable islands, and has excluded and continues to exclude the State of Michigan from her rights thereto; and, more particularly, that "Wisconsin has for many years disregarded the true and

rightful boundary  . . .  and has for a long time past possessed and does now possess, and has asserted and does now assert, civil, criminal and political jurisdiction over those portions of the territory within the Michigan boundaries above described as the Montreal River section, the Menominee River section, and Green Bay section of the disputed territory, aggregating approximately 255,000 acres,  . . .  and has unlawfully taxed and still continues to unlawfully tax said property, . . .." The explanation relied upon is that the State of Michigan, as a result of her excusable ignorance, has not been aware of the real facts and, therefore, should not be held to have lost rights by long acquiescence which she otherwise might have had. This view cannot be accepted and may be dismissed with a reference to what we have already said as to the same defense in respect of the Montreal River section.

In respect of the controversy as a whole, and each of the three sections, the words of this court in *Indiana* v. *Kentucky, supra,* p. 509, are singularly apposite and conclusive:

" . . . It was over seventy years after Indiana became a State before this suit was commenced, and during all this period she never asserted any claim by legal proceedings to the tract in question. She states in her bill that all the time since her admission Kentucky has claimed the Green River Island to be within her limits and has asserted and exercised jurisdiction over it, and thus excluded Indiana therefrom, in defiance of her authority and contrary to her rights. Why then did she delay to assert by proper proceedings her claim to the premises? On the day she became a State her right to Green River Island, if she ever had any, was as perfect and complete as it ever could be. On that day, according to the allegations of her bill of complaint, Kentucky was claiming and exercising, and has done so ever since, the

rights of sovereignty both as to soil and jurisdiction over the land.   On that day, and for many years afterwards, as justly and forcibly observed by counsel, there were perhaps scores of living witnesses whose testimony would have settled, to the exclusion of a reasonable doubt, the pivotal fact upon which the rights of the two States now hinge and yet she waited for over seventy years before asserting any claim whatever to the island, and during all those years she never exercised or attempted to exercise a single right of sovereignty or ownership over its soil.   It is not shown, as he adds, that an officer of hers executed any process, civil or criminal, within it, or that a citizen residing upon it was a voter at her polls, or a juror in her courts, or that a deed to any of its lands is to be found on her records, or that any taxes were collected from residents upon it for her revenues.

" This long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the island is more potential than the recollections of all the witnesses produced on either side.  Such acquiescence in the assertion of authority by the State of Kentucky, such omission to take any steps to assert her present claim by the State of Indiana, can only be regarded as a recognition of the right of Kentucky too plain to be overcome, except by the clearest and most unquestioned proof.  It is a principle of public law universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority."

The result is that complainant has failed to maintain her case in any particular; and that the claims of Wisconsin as to the location of the boundary in each of the three sections are sustained.

The decree, therefore, will be for Wisconsin, costs to be divided between the parties in accordance with the general rule in cases of this character.  *North Dakota* v. *Min-*

*nesota,* 263 U. S. 583. The boundary seems to be sufficiently defined for all purposes of future possession and jurisdiction; but the parties, or either of them, if so advised, may within 30 days submit the form of a decree more particularly to carry this opinion into effect; failing which, a simple decree dismissing the bill will be entered.

*It is so ordered.*