# NEW JERSEY *v.* NEW YORK

No. 120, Orig.   Argued January 12, 1998—Decided May 26, 1998

768

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, in which GINSBURG, J., joined, *post*, p. 812. STEVENS, J., filed a dissenting opinion, *post*, p. 814. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 829.

*Joseph L. Yannotti*, Assistant Attorney General of New Jersey, argued the cause for plaintiff. With him on the briefs were *Peter Verniero*, Attorney General, and *Robert A. Marshall, Patrick DeAlmeida*, and *Rachel Horowitz*, Deputy Attorneys General.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae*. With him on the brief were *Acting Solicitor General Waxman, Assistant Attorney General Schiffer*, and *Deputy Solicitor General Kneedler*.

*Daniel Smirlock*, Assistant Attorney General of New York, argued the cause for defendant. With him on the briefs were *Dennis C. Vacco*, Attorney General, *Barbara G. Billet*, Solicitor General, and *Peter H. Schiff*, Deputy Solicitor General.*

JUSTICE SOUTER delivered the opinion of the Court.

An 1834 compact (hereinafter Compact) between the States of New York and New Jersey provided that Ellis Island, then a modest three acres, was part of New York despite its location on New Jersey's side of the States' common boundary. After 1891, when the United States decided to use the Island to receive immigrants, the National Government began placing fill around its shoreline and over the next

---

*Briefs of *amici curiae* were filed for the City of New York by *Paul A. Crotty, Leonard J. Koerner, Stanley Buchsbaum*, and *Kristin M. Helmers*; for the National Trust for Historic Preservation et al. by *Elizabeth S. Merritt, Laura S. Nelson*, and *Edward N. Costikyan*; for the New-York Historical Society et al. by *Dennis C. O'Donnell*; and for the New York Landmarks Conservancy et al. by *John J. Kerr, Jr.*

42 years added some 24.5 acres to the area of the original Island. The issue in this case is whether New York or New Jersey has sovereign authority over this filled land. We find that New Jersey does.

I

In April 1993, New Jersey invoked this Court's original jurisdiction to try a dispute over its territorial jurisdiction, see U. S. Const., Art. III, §2, cl. 2, by seeking leave to file a bill of complaint against New York. We granted New Jersey's petition, 511 U. S. 1080 (1994), and appointed Paul Verkuil as Special Master, 513 U. S. 924 (1994). After denying the parties' cross-motions for summary judgment, he conducted a trial from July 10 to August 15, 1996, and submitted final and supplemental reports to us on June 16, 1997, 520 U. S. 1273, which were then subjected to the exceptions resolved here.

A

Ellis Island lies in New York Harbor 1,300 feet from Jersey City, New Jersey, and one mile from the tip of Manhattan. At the time of the first European settlement it was mostly mud, sand, and oyster shells, which nearly disappeared at high tide. The Mohegan Indians called it "Kioshk," or Gull Island, while the Dutch of New Amsterdam, after its thrifty acquisition, renamed it (along with two other nearby specks) for the oyster, in recognition of the rich surrounding beds. England seized it from the Dutch in 1664, the same year that Charles II included the Island in a grant to his brother, the Duke of York, of the land and water of the present States of New York and New Jersey. The Duke in turn granted part of this territory to Lord Berkeley and Sir George Carteret, the proprietors of New Jersey, whose domain was described as "bounded on the east part by the main sea, and part by Hudson's river."

Having wasted no words, the noble grantor all but guaranteed the succession of legal fees and expenses arising from

interstate boundary disputes, now extending into the fourth century since the conveyance of New Jersey received its seal. After the Revolutionary War, New York and New Jersey began their long disagreement about the common boundary on the lower Hudson and New York Harbor, with New York arguing that the grant to the New Jersey proprietors set the line at New Jersey's shore and so preserved New York's sovereignty over the entire river, and New Jersey contending that as a coequal State emerging after the Revolution it was entitled to a sovereign boundary in the middle of the river. Between the two competing lines, of course, lay the Oyster Islands, one of which, in 1785, came into the private ownership of the eponymous Samuel Ellis, whose heirs would be its last private owners. In 1800, the State of New York ceded "jurisdiction" over the Island to the United States, reserving only the right to serve judicial process there. Act of Feb. 15, 1800, ch. 6 (1797–1800 N. Y. Laws, p. 454). In 1808, after obtaining property title to the Island as well, the State of New York granted all of its "right, title and interest" in it to the United States, "for the purpose of providing for the defense and safety of the city and port of New-York." Act of Mar. 18, 1808, ch. 51 (1808 N. Y. Laws, p. 273); Act of Mar. 20, 1807, ch. 51 (1807 N. Y. Laws, p. 67); Deed to Ellis Island, by State of New York to the United States, June 30, 1808. Before the War of 1812 began, the United States Army had taken over the Island, which it improved with the construction of barracks and a magazine, and fortified with a battery of 20 guns.

In the meantime, the two neighboring States tried to settle their controversy. In 1807, each appointed commissioners to prepare a compromise agreement, and when none was forthcoming the States allowed the controversy to simmer for another 20 years, when new commissioners were appointed. After they, too, had failed to agree, in 1829 New Jersey decided to seek a judicial resolution and filed suit against New York to establish its "rights of property, juris-

diction and sovereignty" west of the midpoint of the waters of the Hudson River and New York Bay. N. J. Exh. 293 (Complaint filed in *New Jersey* v. *New York*, p. 22 (1829)). New Jersey made it clear in its papers, however, that the dispute did not concern the islands in the waters between the two States, by conceding in its Bill in Equity that during the colonial period New York had taken possession of the islands "in the dividing waters between the two States," and "that the possession thus acquired by New York, ha[d] been since that time . . . acquiesced in" by New Jersey. *Id.*, at 22–23.

Although we took jurisdiction over the suit, *New Jersey* v. *New York*, 5 Pet. 284 (1831), it was never tried to judgment. Instead, the States once again negotiated and in 1833 actually reached agreement. Each enacted the terms into law, 1834 N. Y. Laws, ch. 8; 1833–1834 N. J. Laws, pp. 118–121, and jointly they sought the approval of Congress under the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3. Congressional consent came with the Act of June 28, 1834, ch. 126, 4 Stat. 708.

The Compact comprises eight articles, the first three of which directly concern us here. Article First sets the relevant stretch of the "boundary line" between New York and New Jersey as the middle of the Hudson River "except as hereinafter otherwise particularly mentioned." Article Second provides that "New York shall retain its present jurisdiction of and over Bedlow's [1] and Ellis's islands; and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that state." Under Article Third, "New York shall have and enjoy exclusive jurisdiction of and over all the waters" between the two States as well as "of and over the lands covered by the said waters to the low watermark on the westerly or New Jersey side thereof." This

---

[1] The name of this island, which is now commonly referred to as "Liberty Island," was sometimes spelled "Bedloe's."

jurisdiction is, however, "subject to [certain] rights of property and of jurisdiction of the state of New Jersey." That State, for example, "shall have the exclusive right of property in and to the land under water" on its side of the boundary line, as well as "the exclusive jurisdiction of and over the wharves, docks, and improvements, made and to be made on the shore of the said state." The terms of the congressional consent to the Compact close with the provision that "nothing therein contained shall be construed to impair or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement."

We have already addressed the meaning of some of these terms in *Central R. Co. of N. J. v. Jersey City*, 209 U. S. 473 (1908), where we held that Jersey City, New Jersey, was authorized to tax the submerged lands lying between the middle of New York Harbor and the low-water mark on the New Jersey shore. As expressed in an opinion by Justice Holmes, we determined that the "boundary line" set by Article First is the line of sovereignty between the two States, and that the islands in the waters between them fell on New Jersey's side of the boundary. *Id.*, at 478. We held that even though Article Third grants New York "exclusive jurisdiction" over all the land and water between the States, New Jersey retained "ultimate sovereign rights" over the lands submerged beneath the waters. *Id.*, at 478–479. We noted that the term "jurisdiction" was used in a broader sense in Article Second (relating to the islands) than in Article Third (relating to water and submerged land west of the center line), the purpose of the latter being "to promote the interests of commerce and navigation, not to take back the sovereignty that otherwise was the consequence of Article I." *Id.*, at 479. We said that "[w]hether . . . some power of police regulation also was conferred upon New York [by the third article] . . . need not be decided now." *Ibid.* Finally, we explained that the provision for Ellis and Bedlow's Islands,

"that New York shall retain its 'present' jurisdiction over them, . . . would seem on its face simply to be intended to preserve the *status quo ante,* whatever that may be." *Ibid.* In the current litigation, New York and New Jersey agree that the effect of Article Second was to recognize that New York had obtained sovereign authority over all of the islands in the waters between the two States, including Ellis Island, and that reference to New York's retention of "present" jurisdiction over Ellis Island was a recognition of New York's cession of jurisdiction over the Island to the United States in 1800, save for its right to serve process there.

In the years after the Compact, the National Government continued to use the Island as a fortress until 1861, when it dismantled the fortifications but proceeded to use the Island for a munitions magazine and a berth for ships defending the harbor. In the 1880's, however, came a radical change. Although the National Government had left the control of immigration largely to the States up to that time, the swelling number of immigrants were overwhelming the state systems, to the point of leading Washington to impose national regulation. While immigrants to New York and New Jersey had traditionally come ashore at Castle Garden, located in Manhattan and owned and operated by New York, Congress decided that an island would be an ideal place for a new immigration station "in view of the frauds, robbery, and general crookedness which seemed to be inseparable from the landing of immigrants." N. J. Exh. 488, p. 5 (V. Stafford, Immigration Problems: Personal Experiences of an Official 22 (1925)). Ellis Island turned out to be the one chosen.

The Island also turned out to be too small, and by the time the new Ellis Island immigration station opened in January 1892, the United States had already added enough fill to the surrounding submerged lands to double the original three acres. By 1897, the Island was up to 14 acres and would go on growing for almost 40 years more.

After the original wood and stucco depot burned in 1897, the United States expanded the land for even larger quarters. Although the new depot, which opened in 1900, sat on approximately the same spot on the original Island as the prior main immigration building, it was joined by a hospital placed on a separate island created by landfill in 1899. The National Government often referred to the latter as Island No. 2, which covered about three acres on the southwestern side of a ferry slip. A covered gangway built on piles connected the two islands, which were soon to be joined by one more, though not before the occurrence of another step in the boundary dispute.

Because the hospital of 1900 could not provide sufficiently isolated wards for patients with contagious diseases, these patients were sent to New York City for care and treatment. When, in 1902, the City Health Department announced it would no longer receive such immigrants, the United States had to provide its own contagious disease hospital, which it planned to build on a third island to be joined to Island No. 2 by another gangway. Construction stopped, however, when New Jersey challenged the National Government's appropriation of the submerged lands surrounding the Island. The dispute was not resolved until December 1904, when New Jersey's Riparian Commissioners conveyed to the United States "all the right, title, claim and interest of every kind, of the State of New Jersey" to 48 acres of territory that included and surrounded Ellis Island, in exchange for $1,000. Deed from the State of New Jersey to the United States of America, Recorded, County of Hudson, State of New Jersey, Dec. 23, 1904. The United States then pressed on with construction and in 1906 completed the new island of 4.75 acres, often called Island No. 3. Here the new contagious disease hospital was constructed in 1909 and occupied by 1911.

Two acres more were added in the 1920's when the United States filled the dock basin between Island Nos. 2 and 3, and in 1934 more fill was placed on the northern side of the origi-

nal Island. In the end, the United States enlarged Ellis Island by roughly 24.5 acres, for a total area some nine times the original.

Ironically, however, as the land rose immigration fell. Although more than 12 million people disembarked at Ellis Island from 1892 to 1954, arrivals dropped from a high point of roughly 5,000 daily in 1907 to only 200 a day in 1954, and in November of that year the Immigration and Naturalization Service (INS) closed the Island station.

Soon after immigration was thus diverted from the Island, the United States General Services Administration (GSA) classified the property as surplus and entertained various proposals for using the Island as a home for educational institutions, as a clinic for alcoholics, as a historical site for public recreation, and as a facility for the mentally retarded. Prospects for the Island's future were clouded, however, by the fact that New York and New Jersey each carried the Island on its tax rolls and announced its intention to collect taxes if a private owner took over the Island. Although the GSA noted sanguinely that "[t]he question of whether the property will be subject to taxes by the State of New Jersey when it becomes eligible for taxation is one to be resolved between the State of New Jersey and the grantee after the disposal of the property has been consummated by the United States," N. J. Exh. 117 (letter from Administrator, GSA, to Sen. Clifford P. Case, dated Jan. 28, 1958), there was clear reason to fear that the tax dispute would kill any disposition the United States might like to make. In 1960, the Council of State Governments tried to mediate the jurisdictional dispute, but negotiations simply came to impasse. N. J. Exh. 134 (letter from Regional Director, Council of State Governments, to Associate General Counsel, GSA, dated July 28, 1960).

After the GSA had offered the Island for sale on the commercial market several times, the Secretary of the Interior decided in 1964 that the Government should stop trying to

sell the property and instead develop it as a national historic site, one advantage of such a course being the supposition that "any opening of hostilities between New York and New Jersey" would be obviated. N. J. Exh. 161 (N. Y. Times, Oct. 22, 1964, p. 37, col. 4). But again the optimism was premature, for although the National Park Service was given legal title to the Island and to this day alone exercises jurisdiction over it, and although restoration of the Island began in 1976, New York and New Jersey have continued to assert rival claims of sovereign authority over the filled land of the Island for the purposes of taxation, zoning, environmental protection, elections, education, residency, insurance, building codes, historic preservation, labor and public welfare laws, and civil and criminal law generally. In 1986, efforts of the two States to resolve the tax issue came to naught when New York failed to enact a proposed interstate agreement to deposit tax revenues from the Island into a fund for the homeless. Seven years later, New Jersey was prompted to bring the instant action after the United States Court of Appeals for the Second Circuit held in *Collins* v. *Promark Prods., Inc.*, 956 F. 2d 383 (1992), that New York tort law governed the filled portions of the Island. We are now called upon to determine which State has sovereign authority over the filled portion of the Island.

## B

In its complaint, the State of New Jersey seeks a declaration that the boundary between the two States on the Island follows the high-water mark of the original Island, that the original Island is within the territory and jurisdiction of New York, and that the balance of the Island, as well as the waters surrounding it, is within the territory and general jurisdiction of New Jersey. New Jersey also asks for a permanent injunction prohibiting New York from enforcing its laws on the filled land or asserting jurisdiction over it.

The Special Master first concluded that Article First of the Compact, which establishes "[t]he boundary line between the two states of New York and New Jersey" at the midpoint of the Hudson River and New York Harbor, marks the line of sovereignty between the two States. Next, he concluded that although Article Second accords New York some sovereign jurisdiction over the Island as it existed in 1834,[2] the Compact does not address the issue of sovereign authority over the filled portions of the Island. The Special Master concluded that the filled portions of the Island are subject to the sovereign authority of New Jersey under the common-law doctrine of avulsion, and he rejected New York's affirmatively defensive claim to have obtained sovereign authority over the filled portions of the Island by prescription and acquiescence. He also rejected New York's defense that laches barred New Jersey's complaint, finding the doctrine inapposite to interstate boundary actions.

After concluding that New York's sovereign authority was limited to the original area of the Island, the Special Master went on to determine its exact dimensions, which he pegged to the mean low-water mark of the original Island, although he recommended that the area covered by a pier extending from the shore at the time of the Compact be treated as part of the original Island. Finally, the Special Master recommended, "[i]n the interest of practicality, convenience, and

---

[2] The Special Master did not determine the scope of such jurisdiction and in particular did not determine the present effect of New York's cession of "jurisdiction" to the United States in 1800. Because New Jersey's complaint pleaded only its sovereignty over the filled land, because this is not an action between the United States and the State of New York, and because the United States is only an *amicus curiae* in this proceeding, we have no occasion to declare the extent of New York's sovereign jurisdiction over the original Island. As the United States noted in its *amicus* brief, "the extent to which the federal government exercises legislative jurisdiction over Ellis Island under the Enclave Clause" of the United States Constitution, Art. I, §8, cl. 17, "is not at issue in this case." Brief for United States as *Amicus Curiae* 4, n. 1.

fairness," that we adjust the Island boundary line between the two States so as to place all of the main immigration building and the land immediately surrounding it within New York. Final Report of Special Master 3.

New York and New Jersey each excepted to the recommendations. New York's exceptions amount to the following claims: (1) under Article Second of the Compact, New York has jurisdiction over the filled portion of the Island; (2) New York has obtained sovereignty over the filled land through its exercise of prescriptive acts and New Jersey's acquiescence in that exercise; and (3) New Jersey is chargeable with laches through its delay in bringing this action. New Jersey's exceptions in effect state the following claims: (1) New Jersey is sovereign over the filled portions of the Island to the mean high-water line, not the mean low-water line, as it was when the Compact was adopted; (2) the record contains no credible evidence to support the Special Master's conclusion that the pier on Ellis Island in 1834 was partially built on landfill, so as to place its area within New York's jurisdiction; and (3) the present boundary across the Island must follow the 1834 line, the Court having no authority to modify that line to address considerations of practicality and convenience.

## II

First we address New York's exceptions. Although that State would be entitled to a declaration of its ultimate sovereignty over the filled land if successful on any of the points raised, we find each to be meritless.

## A

New York's first exception rests on Article Second of the Compact, the provision that "[t]he state of New York shall retain its present jurisdiction of and over Bedlow's and Ellis's islands; and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that state."

Neither party takes issue with our holding in *Central R. Co.* that the "boundary line" between the States established in Article First is the line of sovereignty and that Ellis Island is on New Jersey's side of this line.[3]   The States also agree that Article Second carves out an exception to the boundary provision as to all of the islands existing at the time of the Compact, including Ellis Island.  They agree that the recognition in this Article of "present jurisdiction" over Ellis Island suffices to bar any rival claim by New Jersey over the original portion of the Island.  New York's contention is that Article Second also provides for its authority over filled land; New Jersey says it does not.

New York concedes that at the time of the Compact the submerged land around the Island was under the sovereign authority of New Jersey.  But New York argues that because the Compact recognized its own sovereign authority over "Ellis Island," without describing that land mass in metes and bounds, the recognition of sovereignty extended to whatever area the Island so called might be enlarged to cover; that is, once any submerged territory was filled and became fast land contiguous to the original Island, it became subject to the New York sovereignty recognized in Article Second.  New York rests its position on an allegation that in 1834 adding landfill to subaqueous land adjacent to fast land in New York Harbor was such a common practice as to render it unnecessary to mention it in Article Second of the Compact or otherwise make provision for its legal consequences.  New York also argues that the parties who agreed

---

[3] New York's *amici* New York Historical Society et al. and New York Landmarks Conservancy et al. would indeed take issue, arguing that the Compact's terms "jurisdiction" and "property" as variously employed in Articles Second and Third should be read to preclude the New Jersey claim.  But without even relying on *stare decisis* we must pass over the arguments of the named *amici* for the reason that New York, the party to the case, has in effect renounced them, or at least any benefit they might provide.  Accordingly, nothing in this opinion is meant to disparage the scholarship those briefs embody.

to the Compact in 1834 would hardly have wanted to divide the Island between New York and New Jersey, since any such division would frustrate one of the driving purposes of the Compact, of giving New York control over navigation and commerce in the harbor.[4]

The arguments are unavailing. To begin with, the absence of any description of the Island in metes and bounds is highly dubious support for any inference beyond the obvi-

---

[4] We note that New York does not claim that the recognition in Article Third of its "exclusive jurisdiction" over the submerged lands (which have been filled in part at the Island) includes an element of "police power" to regulate historic preservation, land use, and zoning, as New York's *amici* argue. See Brief for National Trust for Historic Preservation in the United States and Municipal Art Society of New York as *Amici Curiae* 26, n. 12; Brief for New York Landmarks Conservancy, Preservation League of New York State, and Historic Districts Council as *Amici Curiae* 17–27. Although we left this very issue open in *Central R. Co. of N. J.* v. *Jersey City*, 209 U. S. 473, 479 (1908), counsel for New York said at oral argument that the grant in Article Third of "exclusive jurisdiction" over the submerged lands and waters between the States "is in the nature of police power, over navigation and commerce in the harbor." Tr. of Oral Arg. 34. New York's counsel argued that when the submerged lands around the Island were filled, New York continued to have jurisdiction over these lands when "used as anchorage, used for docking, used as storage areas, used for lighthouses . . . ." *Id.*, at 35. New York does not argue that Article Third gave New York the authority to regulate anything but commerce and navigation; indeed, counsel for New York said at oral argument that "this case isn't about Article [Third]," *id.*, at 36, and conceded that if it lost its Article Second argument and New Jersey was declared sovereign over the filled land, New Jersey law would apply to that area of the island, *id.*, at 46. Both the New York and New Jersey state courts have also concluded that New York's "exclusive jurisdiction" over the harbor concerns only power to regulate commerce and navigation. See *Kowalskie* v. *Merchants & Miners Transp. Co.*, 76 N. Y. S. 2d 699, 700–701 (Sup. Ct. 1947); *In re Gutkowski's Estate*, 135 N. J. Eq. 93, 102–103, 33 A. 2d 361, 365–366 (Prerog. 1943). While we are not bound by state courts' resolution of interstate boundary disputes, *Georgia* v. *South Carolina*, 497 U. S. 376, 392 (1990); *Durfee* v. *Duke*, 375 U. S. 106, 115–116 (1963), we have no occasion to interpret the terms of the Compact more broadly than the parties who signed it.

ous one, that in 1834 everybody knew what Ellis Island was. The drafters' silence, then, can hardly be taken to convert the Island's name into a definitional Proteus for validating sovereignty claims.

Nor can we draw any conclusion in New York's favor from the failure of the Compact to address the consequences of landfilling, however common the practice may have been.[5] There would have been no reason to do so, simply for the reason that the legal consequences were sufficiently clear under the common law as it was understood in 1834.[6] In this case, as in *Georgia* v. *South Carolina*, 497 U. S. 376, 404 (1990), the expansion of the Island "was not caused by either of the adjoining States, but by the United States Army Corps of Engineers." Under the common law, a littoral owner, like the United States in the instant case, "cannot extend [its] own property into the water by landfilling or purposefully causing accretion." *Ibid.* (citing *Seacoast Real Estate Co.* v. *American Timber Co.*, 92 N. J. Eq. 219, 221, 113 A. 489, 490 (1920)); see also *United States* v. *California*, 381 U. S. 139, 177 (1965) (referring to "the rule of property law

---

[5] Beyond the language cited already, nothing else in the Compact governs the consequence of expanding the Island. The closest approach to the subject of avulsion comes in Article Third, which carves out an exception to New York's exclusive jurisdiction over all the waters of the New York Harbor by specifically providing that New Jersey shall have "exclusive jurisdiction of and over the wharves, docks, and improvements, made and to be made on the shore of the said state."

[6] Although JUSTICE SCALIA, see *post*, at 831–832, seems to make some of the same mistakes in assessing the evidence that JUSTICE STEVENS makes, JUSTICE SCALIA applies his interpretation of the facts to the 1834 Compact, assuming that the agreement was ambiguous about which State would have sovereignty over any land added to the Island, and concluding that the parties' conduct in the years following the Compact indicates that the filled land belonged to New York. But this is to convert an agreement's utter silence on an issue into contractual ambiguity; no such translation is possible here, for the silence of the Compact was on the subject of settled law governing avulsion, which the parties' silence showed no intent to modify.

that artificial fill belongs to the owner of the submerged land onto which it is deposited" (citing *Marine Railway & Coal Co.* v. *United States*, 257 U. S. 47, 65 (1921))). The littoral owner's act of placing artificial fill is thus treated under the traditional common-law rule governing avulsive littoral changes, "recognized where the boundaries between States or nations are, by prescription or treaty, found in running water." *Nebraska* v. *Iowa*, 143 U. S. 359, 361 (1892). We have long recognized that a sudden shoreline change known as avulsion (as distinct from accretion, or gradual change in configuration) "has no effect on boundary," *ibid,* and that this "'is the received rule of law of nations on this point, as laid down by all the writers of authority,'" *id.*, at 362 (quoting 8 Op. Atty. Gen. 175, 178 (1856)), including Sir William Blackstone, 143 U. S., at 364 (citing 2 Commentaries on the Laws of England 262 (1766)). See also *Mayor of New Orleans* v. *United States*, 10 Pet. 662, 717 (1836) (common-law rule of accretion "is no less just when applied to public, than to private rights"); W. Hall, A Treatise on International Law 122 (J. Atlay 6th ed. 1909) (explaining the application of common-law rules of accretion and avulsion in boundary disputes between States). This common-law rule speaks in the silence of the Compact, and we follow it to conclude that the lands surrounding the original Island remained the sovereign property of New Jersey when the United States added landfill to them.[7]

---

[7] Prior to 1891, New Jersey law permitted littoral owners to extend their land artificially by filling in or docking out; in 1891, however, New Jersey repealed that law and enacted a new statement providing that "without the grant or permission of [the New Jersey Riparian Commissioners] no person or corporation shall fill in, build upon or make any erection on or reclaim any of the lands under the tide-waters of this state." Riparian Act, N. J. Comp. Stat., vol. 4, p. 4385, § 10 (1911). Under the new law the Riparian Commissioners were empowered to bring an ejectment action against any person or corporation trespassing or occupying New Jersey lands under water or previously under water. See *Seacoast Real Estate*

Finally, there is no merit in New York's position that depriving it of sovereign authority over the filled land would frustrate the primary purpose of the Compact. The State argues that the Compact's framers must have thought it necessary to recognize New York's sovereign authority over the islands on New Jersey's side of the boundary line in order to assure that New York would be able to regulate commerce and navigation in the New York Harbor. But neither intuition nor history supports its argument. Although it is taken for granted that one object of the Compact was to preserve New York's authority to regulate water-borne commerce in the harbor, a subject addressed in Article Third, the more evident reason that the Compact declared New York's sovereignty over the islands was simply that by 1834 New York had concededly obtained sovereign rights over the islands through prescriptive acts. New Jersey conceded as much when it filed its bill of complaint in *New Jersey* v. *New York.* While Article Third does speak to commerce and navigation, New York's "exclusive jurisdiction" over the water and submerged lands lying between the two States is unaffected in any literal sense by the presence of the fill, and there is no reason to think that recognizing New Jersey as sovereign over the filled portions of the Island would affect New York's ability to regulate navigation and commerce in the harbor.

B

On the assumption that Article Second or some other Compact provision fails to carry the day for New York, the State

---

*Co.* v. *American Timber Co.,* 92 N. J. Eq. 219, 219–220, 113 A. 489, 490 (1920).

New York's *amicus curiae* the City of New York suggests that under *United States* v. *California,* 381 U. S. 139, 176 (1965), a State may unilaterally alter its boundary line by artificially extending its coastline. Brief for City of New York as *Amicus Curiae* 25. That case, however, involved the interpretation of the Submerged Lands Act, 43 U. S. C. § 1301 (1958 ed.), which is not involved in the instant case.

falls back to its affirmative defense that it gained sovereign authority over the made land by subjecting it to prescriptive acts for a considerable period. Again, the State's position is unsound.

As between two sovereigns, jurisdiction may be obtained by one through prescriptive action at the other's expense, over the course of a substantial period, during which the latter has acquiesced in the impositions upon it. See *Illinois* v. *Kentucky,* 500 U. S. 380, 384–385 (1991); *Georgia* v. *South Carolina,* 497 U. S., at 389; *Arkansas* v. *Tennessee,* 310 U. S. 563, 570 (1940); *Vermont* v. *New Hampshire,* 289 U. S. 593, 613 (1933); *Louisiana* v. *Mississippi,* 202 U. S. 1, 53 (1906); *Virginia* v. *Tennessee,* 148 U. S. 503, 522–524 (1893). "For the security of rights, whether of states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be involved with greater justice and propriety than in a case of disputed boundary." *Rhode Island* v. *Massachusetts,* 4 How. 591, 639 (1846). The doctrine of prescription and acquiescence "is founded upon the supposition, confirmed by constant experience, that every person will naturally seek to enjoy that which belongs to him; and the inference fairly to be drawn from his silence and neglect, of the original defect of his title, or his intention to relinquish it." C. Phillipson, Wheaton's Elements of International Law 269 (5th ed. 1916). From such expectations, in part, have we derived "moral considerations which should prevent any disturbance of long recognized boundary lines; considerations springing from regard to the natural sentiments and affections which grow up for places on which persons have long resided; the attachments to country, to home and to family, on which is based all that is dearest and most valuable in life." *Virginia* v. *Tennessee, supra,* at 524.

As the proponent of the defense, New York is in the position it would occupy if it had itself brought an original action claiming title under the doctrine; thus it has the burden to

"show by a preponderance of the evidence . . . a long and continuous possession of, and assertion of sovereignty over," the filled portions of the Island, as well as New Jersey's acquiescence in those acts of possession and jurisdiction. *Illinois* v. *Kentucky, supra,* at 384. Because acquiescence presupposes knowledge, New York is bound to present either direct evidence that New Jersey had knowledge that New York acted upon a claim to the added land, or evidence of such open, notorious, visible, and uninterrupted adverse acts that New Jersey's knowledge and acquiescence may be presumed. See *Georgia* v. *South Carolina, supra,* at 393 (stating that it is well established "'that open and notorious adverse possession is evidence of notice; not of the adverse holding only, but of the title under which the possession is held'") (quoting *Landes* v. *Brant,* 10 How. 348, 375 (1851)); *Arkansas* v. *Tennessee, supra,* at 570 (noting that sovereign rights to land can be won and lost by "open, long-continued and uninterrupted possession of territory"); *Michigan* v. *Wisconsin,* 270 U. S. 295, 307–308 (1926) (rejecting Michigan's claim of "excusable ignorance" on the ground that "[t]he material facts . . . have been so obvious that knowledge of them on the part of the Michigan authorities, if it were not shown, as it is shown, by the evidence, must necessarily be assumed"); *Louisiana* v. *Mississippi, supra,* at 53 (noting that "Louisiana has always asserted [ownership of the disputed area]; and that Mississippi has repeatedly recognized it, and not until recently has disputed it"); MacGibon, The Scope of Acquiescence in International Law, in 31 Brit. Y. B. Int'l L. 143, 173 (H. Lauterpacht ed. 1954) ("The proposition that the possession on which title by prescription rests must fulfil *[sic]* the requirement of notoriety is scarcely in doubt").

It is essential to appreciate the extent of this burden that a claimant by prescription must shoulder. Even as to *terra nullius,* like a volcanic island or territory abandoned by its former sovereign, a claimant by right as against all others has more to do than planting a flag or rearing a monument.

Since the 19th century the most generous settled view has been that discovery accompanied by symbolic acts gives no more than "an inchoate title, an option, as against other states, to consolidate the first steps by proceeding to effective occupation within a reasonable time."[8]  I. Brownlie, Principles of Public International Law 146 (4th ed. 1990); see also 1 C. Hyde, International Law 329 (rev. 2d ed. 1945); 1 L. Oppenheim, International Law §§ 222–223, pp. 439–441 (H. Lauterpacht 5th ed. 1937); Hall, A Treatise on International Law, at 102–103; 1 J. Moore, International Law 258 (1906); R. Phillimore, International Law 273 (2d ed. 1871); E. Vattel, Law of Nations § 208, p. 99 (J. Chitty 6th Am. ed. 1844).  Thus, even on the remote Pacific atoll mentioned in JUSTICE STEVENS's dissent, *post*, at 824, something well beyond "[a] solitary fingerprint," *post*, at 815, will always be necessary to carry the day.  This rule underscores the burden on a sovereign claimant to an atoll already subject to clear title, as under the law of avulsion.  Hence the law's emphasis on the necessary length and continuity of adverse activity, and the requirement to prove a knowing acquiescence in the claimant's demonstrated design.  Conversely, the original titleholder's only obligation is that of refusing to acquiesce in the hostile behavior of a rival sovereign claimant that was or should have been known to be disputing the earlier title.[9]  Since the parties do not start out as equals in

---

[8] After all, a contrary rule "would be an absolute infringement of the natural rights of men, and repugnant to the views of nature, which, having destined the whole earth to supply the wants of mankind in general, gives no nation a right to appropriate to itself a country, except for the purpose of making use of it, and not of hindering others from deriving advantage from it."  E. Vattel, Law of Nations § 208, p. 99 (J. Chitty 6th Am. ed. 1844).

[9] Accordingly, New York cannot meet its burden of proving prescription by pointing to New Jersey's failure to present evidence that it exercised dominion over the filled portions of the Island occupied by the United States or secondary evidence that third parties understood the filled land

sovereign pretension, a single fingerprint that can never suffice for title even when there is only one claimant will fail all the more abjectly when a claim is made against a holder of title independently established.

Before turning to the evidence, a word must be said on one threshold issue, on which the parties agree. As the Special Master thought, the time period during which New York's prescriptive acts ripened into sovereignty, if they did at all, is 1890 to 1954. The United States added no fill to the original Island until 1890, and after 1954 it is undisputed that New Jersey vigorously asserted its own sovereignty over the filled portions of the Island. At most, then, New York may rely upon exercises of dominion over the made land with New Jersey's consent for 64 years,[10] a period that is not insufficient as a matter of general law. To be sure, we have never established a minimum period of prescription necessary to perfect a jurisdictional claim over another State's territory, and it is clear that "no general rule can be laid down as regards the length of time and other circumstances which are necessary to create a title by prescription. Everything depends upon the merits of the individual case. . . .

---

to be in New Jersey. That is, however, what JUSTICE STEVENS would apparently permit New York to do. See, e. g., post, at 814–815 ("There is no evidence that any of those people ever believed that any part of Ellis Island was in the State of New Jersey"); post, at 818 ("There is no evidence that any [birth or death] certificate was issued by New Jersey"); post, at 819 ("There is no evidence of any Ellis Island resident being married under New Jersey law"); post, at 821 ("There is no evidence that any of [the Island] residents prepared or received any mail or other documents describing their residence as in New Jersey"); post, at 822 (relying upon the lack of evidence that New Jersey provided municipal services on the Island); post, at 823 ("Nor is there any evidence that any judge, state or federal, ever held that Ellis Island was a part of New Jersey").

[10] Because the United States continued to expand the Island until 1934, the relevant period for some parts of the Island is much shorter. As will appear, niceties of timing do not affect the outcome here.

There are indeed immeasurable and imponderable circumstances and influences besides the mere lapse of time at work to create the conviction that in the interest of stability of order the present possessor should be considered the rightful owner of a territory." 1 Oppenheim, *supra*, §242, at 456–457. We have, however, found 60 years adequate in one case, see *Michigan* v. *Wisconsin, supra*, and that holding is enough to open the door to litigation of the relevant period here.

The evidence that has come through the door, however, is too slight to support any finding of prescription. At the outset, we note that two facts exact a discount from the probative force of much of the evidence New York presents. First, as between New York and New Jersey, New York is concededly vested with whatever state sovereignty may be exercised over the original portion of the Island. Second, throughout the entire period of arguable prescription, the Island was entirely occupied by the United States.

We have already seen that Article Second of the Compact recognizes New York's then-existing jurisdiction over Ellis Island and Bedlow's Island as well as its exclusive jurisdiction over the other islands then on New Jersey's side of the boundary. So long as the original Island was all that went by the name of Ellis, there was no question about the referent of any indication of jurisdiction over Ellis Island. But after the Island grew, acts expressly pertaining to the Island but falling short of physical occupation became to a degree vague in the absence of further indication that their subject was the new land as well as the original territory.[11] Thus, every reference to "Ellis Island" on a New York tax roll or

---

[11] For this reason there is no prescriptive significance in the fact pointed out by JUSTICE STEVENS, *post*, at 822, that a New York state court exercised jurisdiction over an assault that took place "upon government property at Ellis Island," *Rettig* v. *John E. Moore Co.*, 90 Misc. 664, 154 N. Y. S. 124 (N. Y. App. Term 1915), there being no indication that the court considered whether the assault took place on the filled portion of the Island.

a statute outlining the confines of a voting district was necessarily sound in part (so far as New Jersey might be concerned) in the absence of a physical description making a claim to the new land as well as the old. So, registrations of vital statistics did not on their face refer to events beyond the original Island (though knowledge of the geography would point to hospitals on the new land in a number of instances). And the use of mailing addresses of the Island in "New York" was likewise equivocal (a point underscored by the fact that the Island was within the New York postal district, whatever the political geography might otherwise be). This vagueness was important, having a significance that stems from the burden to give notice to the adverse party before a prescriptive claim can begin to run. See *supra*, at 786–789. Thus, New Jersey suffers nothing unless New Jersey must at least reasonably be supposed to have known that an attempt by New York to deal officially with "Ellis Island" referred to something more than the original, concededly New York territory (on the assumption that it was subject to the authority of any State at all).

Second, it is well to realize how far the presence of the National Government and its particular activities throughout the period necessarily limited the range of prescriptive acts New York might possibly have performed and the information any acts performed might convey to New Jersey about New York's intentions. Although New Jersey has not argued that the occupation of the filled land exclusively by the United States throughout the prescriptive period precluded any requisite occupation by New York as a matter of law (and we express no opinion on that point, cf. *Georgia* v. *South Carolina*, 497 U. S., at 389 (finding prescription where United States Army Corps of Engineers had performed some work on territory in dispute); *Arkansas* v. *Tennessee*, 310 U. S., at 571–572 (rejecting argument that prescription is not possible where the United States holds title to land)), much of the standard evidence of sovereign prescription is

out of the question in this case. New York, for example, has been in no position to establish towns, roads, or public buildings, see *Michigan* v. *Wisconsin*, 270 U. S., at 306–307; *Maryland* v. *West Virginia*, 217 U. S. 1, 40 (1910), or otherwise actually occupy the area of the Island in dispute, see *Georgia* v. *South Carolina*, *supra*, at 393 (charging Georgia with the knowledge that South Carolina was cultivating the territory in question). Instead, the United States Army Corps of Engineers and the Procurement Division of the Treasury Department controlled all construction and improvements. Nor did New York enjoy any substantial opportunity to assess taxes on the land and activities on the Island, and so generate the kind of evidence of prescription that we have found particularly persuasive in prior cases. See *Illinois* v. *Kentucky*, 500 U. S., at 385; *Georgia* v. *South Carolina*, *supra*, at 392; *Arkansas* v. *Tennessee*, *supra*, at 567; *Maryland* v. *West Virginia*, *supra*, at 40–41; *Virginia* v. *Tennessee*, 148 U. S., at 515. Until the passage of the Buck Act, ch. 787, 54 Stat. 1059,[12] in 1940, no State or municipality could impose taxes in a federal area located within that State or municipality, and there is no evidence that New York collected any taxes from activities taking place on the Island until 1991, long after the possible prescription period was over. Nor was there any significant opportunity for New York to grant land or register deeds to land on the Island, actions that have produced evidence in prior cases

---

[12] The Buck Act provides that "[n]o person shall be relieved from liability for payment of, collection of, or accounting for any sales or use tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, on the ground that the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal area; and such State or taxing authority shall have full jurisdiction and power to levy and collect any such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area." 4 U. S. C. § 105(a). The definition of "Federal area" under the Act includes "any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency, of the United States." § 110(e).

when assessing prescriptive acts, see, *e. g.*, *Vermont* v. *New Hampshire*, 289 U. S., at 614–615; *Indiana* v. *Kentucky*, 136 U. S. 479, 510 (1890); it is undisputed that by 1904 the United States held title to all of the Island. Nor was there the normal opportunity for a claimant State or its agencies to meet the normal governmental responsibility for public protection, as in providing police and fire protection to the disputed area. The National Government had its own firefighting equipment and security force and rarely received any help from New York; the State showed that it furnished assistance on only three isolated occasions, in 1897 when the immigration depot burned to the ground, in 1905, when a cheating federal employee working in the telegraph office was sent off to the Ludlow Street jail in New York City, and in 1916, when German saboteurs set fire to barges that floated to Ellis Island and ignited the Island's seawall.[13]

---

[13] Not only are these incidents spotty, they are also consistent with New York's jurisdiction over the harbor waters granted by Article Third of the Compact and with New York's undisputed authority over the original Island. The fire of 1897 involved buildings that were almost entirely on the original Island, and the telegraph official arrested in 1905 was working in the main immigration building, which was also located on the original Island. Finally, as the Port Authority of New York and New Jersey recognized in 1991, "[t]he City of New York has historically provided fireboat protection for the waterfront areas of the New York Harbor." N. Y. Exh. 917 (letter to Norman Steisel, First Deputy Mayor, dated Apr. 12, 1991). Accordingly, putting out the fire on the seawall of the Island in 1916 was not an apparent act of prescription; it was in keeping with New York's exclusive jurisdiction over waters of the harbor. But even leaving New York's harbor jurisdiction aside, the act of one sovereign in helping a neighboring government put out a fire would hardly suggest that territorial aggrandizement was afoot.

There is also evidence that two criminal complaints were filed in New York City Municipal Court involving Ellis Island residents, but, as New York admitted, "it is not clear from those complaints whether the criminal acts occurred on Ellis Island." New York's Response to New Jersey Request for Admission 35 (Request No. 82).

In stating that "[i]n 1942, the New York City Police Department formed a special squad to assist federal officials in questioning immigrants arriv-

The United States' occupation of the land under the cession affected not only New York's opportunity to act in support of its claim but also the degree of attention that New Jersey may reasonably be supposed to have paid to whatever acts New York claims to have performed in asserting its jurisdiction. Thus, for example, a State should well know that the residents of a populated enclave of its land have wholly failed to register or vote; but it is far less likely that New Jersey was aware of such resident population as the United States did maintain on the Island, or that it had any idea that some of those residents were registered to vote in New York instead of some other place where they might vote as absentees. Governor Rockefeller put this point well when he remarked in 1959 that "[f]or more than fifty years, the question [of which State has sovereignty over Ellis Island] has been of relatively little importance because the Federal Government has owned and administered [the Island]." N. J. Exh. 123 (letter from Governor Rockefeller to Louis Harris, dated June 4, 1959).

In sum, the peculiar facts of this case affected New York's capacity to invoke a sovereign's claim as well as the significance of such acts it now adduces as prescriptive in character. New York's position as sovereign of the original Island

---

ing at the Island," *post*, at 822, JUSTICE STEVENS presumably relies upon the testimony of New York's expert witness Harlan Unrau. As evidence that New York provided this assistance, however, Unrau relied upon 10 letters from the New York City Police Department to the INS requesting information about aliens originating in Germany. These documents give no indication that members of the New York City Police Department were themselves present on the Island to question immigrants. Indeed, although the INS's 1942 year-end report mentioned that "the Army and Navy intelligence services, the Department of State, the Federal Bureau of Investigation, the Coast Guard, the Customs Service, and the Immigration and Naturalization Service cooperated in a plan whereby all incoming passengers, both aliens and those claiming U. S. citizenship, were carefully investigated," N. J. Exh. 530, pp. 8–9, the report does not mention that any state agency participated in the interrogation.

under the Compact rendered any statement of "Ellis Island, New York" equivocal, without more, for prescriptive purposes, and the National Government's occupation tended to limit the notice to New Jersey of such acts as New York did perform. To weigh New York's evidence with an appreciation of these twin hurdles is not, as JUSTICE STEVENS charges, to resort to hypertechnicality, but to recognize that New York has a substantial burden to establish that it gave good notice to New Jersey of its designs on the made land. We accordingly examine the evidence of prescriptive activity that New York did serve up, which is closer to famine than feast. It falls into four principal categories.

### 1

There is some evidence that New York recorded vital statistics of people on the Island. The record contains New York certificates recording five births that probably occurred on the filled portions of the Island,[14] 22 New York certificates recording deaths on the Island, all but one of which are from a single 4-month period in 1924, and five[15] marriage certificates, four from 1901 and one from 1914.[16] For a period of

---

[14] New York also presented evidence of 17 birth certificates recording births before the 1897 fire on the Island. These certificates are not evidence of prescription, however, because New York failed to show that these births took place on the original Island; nothing in the record indicates where the hospital was located in 1897.

[15] There are actually six certificates in evidence, but one is a duplicate.

[16] The marriage certificates are augmented by Edward Corsi's interview of an Island employee named Frank Martocci, who recalled "numberless" weddings on the Island (said to have been solemnized under New York law) until the policy of marrying immigrants on the Island was dropped and the immigrants were brought to City Hall in New York instead. N. Y. Exh. 74, p. 409 (E. Corsi, In the Shadow of Liberty: The Chronicle of Ellis Island 87 (1935)). One of New York's witnesses, Harlan Unrau, the historian for the National Park Service, testified that Fiorello La Guardia's memoirs also describe trips to and from the Island to Manhattan to tie the knot. Tr. 3615–3618 (Aug. 8, 1996). This evidence amounts to little in the absence of recording, and at most would show that immigrants undomi-

64 years, this does not add up to much,[17] and even its meager significance is diminished by the absence of evidence of any regulation of the State or City of New York or the National Government providing for the registration in New York of births and deaths that occurred on the Island. Of the marriage certificates, the one dated 1914 indicates that the marriage took place on Manhattan Island, not Ellis Island, and the 1901 certificates reflect marriages that were probably performed in the Main Building, located on the original Island. There is no evidence that any marriages solemnized under New York law took place on the filled portion of the Island. Immigration officials were apparently concerned about complying with a law passed by New York in 1907 that required couples getting married to obtain a marriage license from the town in which the woman resided. 1907 N. Y. Laws, ch. 742. But that same law also provided that if the woman or both parties were nonresidents of the State, the marriage license could be obtained from the State in which the marriage was to be performed. *Ibid.* Obtaining a New York marriage license therefore carried no necessary implication of residence, and at the times in question the immigrants were, of course, undomiciled in America.[18] In sum, the foregoing evidence cannot possibly be claimed to show any continuous practice, and 32 record entries over more than six decades is not even arguably persuasive as circumstantial evidence that New York was acting on a claim of

---

ciled in America were probably married in the Main Building at one time and later were taken to Manhattan.

[17] New York's expert testified that from 1890 to 1954 there were hundreds of births and thousands of deaths on the Island. Tr. 2719–2720, 2740 (July 31, 1996).

[18] The record suggests that all the marriages taking place on the Island and later at City Hall in Manhattan were marriages between immigrants or between a resident of the United States and a person who had just arrived. Immigration officials hoped that requiring young single women to marry their fiancés before they would be admitted to the country would help stem the importation of prostitutes.

 

right to any part of the Island or that New Jersey's officials must have known about the acts or the claim.

### 2

New York presented evidence of New York State and New York City statutes and ordinances that included the Island in voting districts, together with voting registration lists with names of people who indicated that they lived on filled portions of the Island. The limited force of this evidence is, however, manifest. The state statutes make no specific reference to the filled land, and even if they are read as doing so, they are evidence of claims made in Albany or Manhattan, not acts of sovereignty on the Island. Nor does the legislation reflect any awareness of changes in the Island's territory over time. The same New York statutes for the establishment of Senate and Assembly districts covering Ellis Island also purport to include another of the so-called Oyster Islands that had been dredged out of existence by 1903, see 1916 N. Y. Laws, ch. 373; 1917 N. Y. Laws, ch. 798; 1943 N. Y. Laws, ch. 359; in fact, the reference to the latter was not deleted from the New York statutes until 1953, see 1953 N. Y. Laws, ch. 893, and the related maps of the First and Second Assembly districts continued to show the missing Oyster Island as late as 1945. The depiction of Ellis Island on these maps remains constant even though throughout the first third of this century the Island continued to change size and shape. N. Y. Exhs. 957–963 (maps of Borough of Manhattan, 1st and 2d Assembly Dists., issued by Bd. of Elections of N. Y. C. (1918, 1926, 1927, 1929, 1930, 1939, 1945)). Since New York made no effort to update its description of voting districts to eliminate the reference to Oyster Island, never specifically indicated an intent to include the filled land in its voting districts, and failed to make any alteration in its representation of the Island on its voting maps, its legislative acts were not overtly prescriptive and furnished no reason for New Jersey to infer that New York intended to include

the filled portions of the Island in its voting districts. To the extent that the registration lists, on the other hand, have at least some tendency to suggest activity on the Island, there are lists for only 10 years out of the prescriptive period (1917, 1918, 1919, 1925, 1926, 1930, 1936, 1939, 1945, and 1953), and why New Jersey might have known about these lists is not addressed by any specific evidence.

### 3

The third category of New York's proffered prescription evidence covers personal impressions that the filled portions of the Island belong to New York. We have recognized before that the belief of the inhabitants of disputed territory that they are citizens of one of the competing States is "of no inconsiderable importance." *Handly's Lessee* v. *Anthony*, 5 Wheat. 374, 384 (1820); see also *Maryland* v. *West Virginia*, 217 U. S., at 41, 44 (noting that people living in the disputed territory gave allegiance to West Virginia); *Virginia* v. *Tennessee*, 148 U. S., at 527 (noting that all but a handful of the residents of the disputed territory considered themselves citizens of Tennessee). New York's strongest items of this sort of circumstantial evidence are the voting registration lists for 10 of the possible 60 years, on which numerous individuals list their residence as "Ellis Island, New York." The significance of the declarations is qualified, however, for the reasons we have already given, and the rest of New York's evidence about the understanding of individuals is hardly worth mentioning. This includes, for example, documents indicating that the same two men who witnessed the Commissioner of Immigration's signature on contracts four different times in 1908 and 1909 listed their residences as "Ellis Island, NY"; that another witness did the same once in 1904, and two others did in 1908. On one petition for naturalization filed in 1911 the applicant listed her residence as "Ellis Island, New York," as did her witness. Finally, one William Hewitt, who lived in the officers' quarters on the Island with

his family from July to September 1940 when he was one year old, testified that although he had "no personal recollection" of living on the Island, he has always thought that at that time he was living in New York. Tr. 3144–3145 (Aug. 5, 1996).[19]

4

The final category of relatively noteworthy evidence covers indications that during the relevant period the United States understood the filled portions of the Island to be part of New York. It is not, of course, that the understanding of officials of the United States, even those on the Island, is itself tantamount to prescriptive activity. The United States was in no sense New York's proxy. See *California v. Nevada*, 447 U. S. 125, 131 (1980) (noting that the United States does not have the power to reestablish boundary lines). It may, however, amount to persuasive evidence that a State's prescriptive acts have succeeded in their object.[20]

While the record does indeed contain some such evidence favorable to New York, other indications point the other way.

---

[19] JUSTICE STEVENS contends that "[t]he evidence indicates that the millions of immigrants entering the country . . . believed that Ellis Island was located in New York." *Post*, at 820. Because New York presented no testimony to this effect, JUSTICE STEVENS relies upon steamship tickets, certificates of arrival, and landing cards that stated that the holder was going to or had arrived in New York. These various documents are entirely accurate insofar as every immigrant arriving at Ellis Island was processed through the New York Immigration District. But the documents prove nothing for this case, since throughout the period from 1891 to 1956 the New York Immigration District included northern New Jersey.

[20] When the understanding of national officials takes the form of published records, it may help to place a State on notice of an adverse claim and present occasion to protest or acquiesce. See, *e. g., California v. Nevada*, 447 U. S., at 129–130 (noting that both States had adopted the United States Coast and Geodetic Survey line by statute and used it for nearly 80 years); *Vermont v. New Hampshire*, 289 U. S. 593, 613 (1933) (there was evidence that both States were familiar with congressional resolutions locating the disputed territory in Vermont but New Hampshire did not object); *Louisiana v. Mississippi*, 202 U. S. 1, 53–58 (1906).

In fact, the full record reveals not merely one understanding on the part of some United States officials about the Island's sovereignty, but three different understandings on this point, inconsistent with each other and inconstant over time.

First, there is some evidence that officials of the United States may have thought the entire Island was in New York. At various times from 1903 to 1925 the Commissioner of Immigration on Ellis Island used New York wages as a benchmark to show the need to raise the wages of federal workers on the Island. And although federal specifications governed construction projects on the Island, federal inspectors are known to have alluded to New York building codes as if they had been bases for relevant comparisons; a federal inspector would occasionally remark that if a particular building were subject to New York regulations, it would have to be condemned, and once, in 1935, when an official in the Public Works Branch of the Procurement Division recommended accepting a contractor's request to use a particular kind of bolt, the official noted that his New York counterparts had allowed the bolt to be used.[21] References to New York regulations as benchmarks do not, then, necessarily indicate that federal officials actually thought the filled land was part of New York.

After the passage of the Davis-Bacon Act, 46 Stat. 1494, however, comes less equivocal evidence of understanding. As originally enacted, this statute provided that workers on "any public buildings of the United States" be paid at a rate "not less than the prevailing rate of wages for work of a similar nature in the city, town, village, or other civil division of the State in which the public buildings are located," *ibid.,*

---

[21] In 1905, a contract for work on the Island required that the work "must be of the best quality and in strict accordance with the present rules and regulations of the Department of Water Supply, Gas and Electricity, New York, N. Y." N. Y. Exh. 638, p. 47. This is the only contract on record where contractors were required to follow New York regulations as if they were binding.

and there is evidence that from 1931 to 1934 construction contracts for work on filled portions of the Island provided that wages for the City of New York applied.[22] The National Government also treated Ellis Island as part of New York in the 1900, 1910, 1920, and 1940 national censuses, and throughout the prescription period various officials referred to "Ellis Island, New York," in correspondence.[23]

But the National Government was nothing if not pluralistic in its views on the matter. In 1900, when the Government requested proposals for a kitchen and restaurant building on the Island, its announcement stated that "Ellis Island is not under the jurisdiction of the State or City of New York. The New York City and State Building Laws and

---

[22] New York also presented evidence that in 1934 New York processed two workmen compensation claims for injuries sustained on filled land; it was not until 1936, however, that Congress permitted the application of state law to federal workmen's compensation claims. See *Murray* v. *Joe Gerrick & Co.*, 291 U. S. 315 (1934). Nor is it clear from the record that the processing of these claims actually involved the application of New York law; the processing may be explained simply by the fact that the contractor for whom the victims worked was located in New York.

[23] In *United States ex rel. Belardi* v. *Day*, 50 F. 2d 816, 817 (1931), the Third Circuit held that Ellis Island was within the territorial jurisdiction of the District Courts of the Eastern and Southern Districts of New York. The court explained that "[w]hen [the Island] was property of New York it was within one or another of the counties of that state or within the waters thereof," and the former 28 U. S. C. § 178 (now 28 U. S. C. § 112) places the waters of the New York counties within the concurrent jurisdiction of the Southern and Eastern Districts. The court held that even though the 1834 Compact placed the Island on New Jersey's side of the boundary, "[t]he running of a boundary line in 1834 through the waters dividing the states of New York and New Jersey cannot disturb the statutory designation of jurisdiction in 1910." 50 F. 2d, at 817. Thus, the Third Circuit simply read the jurisdictional statute as placing any location within the waters subject to New York jurisdiction (as, under the Compact, the harbor waters were, for police purposes, even on the New Jersey side of the line) within the concurrent jurisdiction of the two named federal districts. The Third Circuit explicitly avoided determining anything about state sovereignty over the Island.

City Ordinances will not apply to the same in regard to building matters." N. Y. Exh. 775, sheet OO. From 1890 to 1911, however, the federal spokesmen did not stop at saying merely that the Island was not part of New York; in these years the federal Harbor Line Board prepared surveys of recommended Island pierhead and bulkhead lines for the approval of the Secretary of War, all of which were titled "Pierhead & Bulkhead Lines for Ellis' Island, New Jersey, New York Harbor, as recommended by the New York Harbor Line Board." App. to Exceptions of New Jersey 21a, 22a.[24] In 1904, as said before, the United States made an application to the Riparian Commission of New Jersey for certain lands under water adjacent to Ellis Island. The United States Attorney General, William Moody, at that time explained that the Government had not made the application earlier because it had previously "proceeded upon the theory that the ownership of the lands under water around Ellis Island was in the State of New York," but changed its view because "it would seem from [the Compact] that the ownership of the lands under water west of the middle of the Hudson River and of the Bay of New York is in the State of New Jersey." N. J. Exh. 351 (letter from U. S. Atty. Gen. William Moody to the Riparian Comm'n of New Jersey 1–2, dated July 15, 1904).[25] In 1933, New Jersey got the nod again when the

---

[24] JUSTICE STEVENS brands this ascription to New Jersey as "obviously . . . a mistake." Post, at 826, n. 17. But the mistake (as to the original Island) was not obvious. See n. 25, infra.

[25] The New York Times reported that "[t]he chief interest in the application lies in the fact that it is a recognition of the claim that New Jersey and not New York owns the submerged lands in the vicinity of Ellis Island." N. J. Exh. 5 (N. Y. Times, July 19, 1904).

JUSTICE STEVENS contends that once New Jersey transferred title to the submerged lands to the United States "the parties may reasonably have believed that the State thereafter possessed neither ownership nor jurisdiction over that area, particularly since the Compact had provided that New York was entitled to exercise jurisdiction over the surrounding

INS applied to New Jersey for permission to construct a new seawall on filled land, which it received.[26]

Within a year of that, however, yet another view of the filled land's sovereignty began to develop in two other federal agencies, the view that neither State had a jurisdictional claim. Two Members of Congress from New Jersey, Senator

---

surface." *Post*, at 816. On the contrary, the reasonableness of any such belief is belied by the fact that New York, to this day, has never claimed that it had any such understanding, presumably for two very good reasons. First, in transferring "all the right, title, claim and interest of every kind" in certain submerged lands to the United States in 1904, New Jersey's conveyance sounded much like New York's conveyance to the National Government in 1808 of all "right, title, and interest" in the original Island. (While the latter transfer was expressly "for the defense and safety" of the city and port, these words were not treated as limitations on the rights of the United States even when it converted the Island from a military installation to an immigration station.) If, then, New York had believed that New Jersey had no interest left to assert, it would have had to say the same for itself in relation to the original Island. Indeed, New York would have been in an arguably weaker position: in 1800 it had ceded "jurisdiction" to the United States (saving only its right to serve process), the territory subject to its conveyance was within the boundary of New Jersey, and New York had no general territorial right in the area except police jurisdiction over the waters. The arguably comprehensive extent of the New York conveyances is, moreover, the reason that JUSTICE STEVENS is mistaken to label the 1890–1911 federal Harbor Line Board maps as obviously wrong. See *post*, at 826–827, n. 17.

Second, if the United States, and not New Jersey, had sovereign authority over the filled land as a result of the 1904 transfer, New York's prescriptive claim to that territory would fail as a matter of law; the United States is immune to prescription by a domestic entity. *Texas* v. *Louisiana*, 410 U. S. 702, 714 (1973); *United States* v. *California*, 332 U. S. 19, 39–40 (1947).

[26] JUSTICE STEVENS, *post*, at 826, n. 17, contends that Corsi, who made the application on behalf of the INS, must have thought the seawall would be constructed in New York because he entered "New York" in a space on the permit application asking "[w]here work is contemplated." If Corsi truly thought the seawall was going to be constructed in New York, however, he must have been a whimsical soul to apply to New Jersey for a permit.

Hamilton F. Kean and Representative Mary T. Norton, wrote to the Department of Labor expressing concern that federal contractors were not hiring members of New Jersey's union locals even though the Island work site was part of New Jersey. N. J. Exhs. 12, 24–27. The Department of Labor asked the Procurement Division of the Public Works Branch of the Treasury Department for advice on this issue, and the Procurement Division originally decided that "[s]ince Ellis Island is not clearly within the boundary lines of either state and is clearly outside of the jurisdiction of either, workers should be drawn in roughly equal proportions from the two states." N. J. Exhs. 24, 33–35. When the Jersey City, New Jersey, chapter of Bricklayers, Masons, and Plasterers International Union would not settle for this neutrality and pressed the Treasury Department for a statement that Ellis Island was in New Jersey, the Department managed to lob the question back to the Department of Labor, whose solicitor (later Judge) Charles E. Wyzanski, Jr., sent this response: "[I]t seems to me perfectly apparent that your answer is sound: Ellis Island and Bedloe's Island are no more a part of New York or New Jersey than the Philippine Islands or Hawaii are. They are territories of the United States not falling under the jurisdiction of any one of the forty-eight states." N. J. Exh. 43. And yet matters did not rest there for long, for when a Government contractor, the Driscoll Company, later learned that it would have to employ both New York and New Jersey workers, it wrote to the Treasury Department calling attention to the 1834 Compact, of which the agency apparently had been unaware. With skillful evasiveness, the Treasury replied that under the Compact, "[t]he question appears to be one of fact: whether Ellis Island is within the territorial limits of New York or New Jersey. This does not seem to be a matter for determination by the Board of Labor Review." N. J. Exh. 51. When the contractor continued to protest any requirement to hire workers from New Jersey, the Procurement Division

responded that "Article 2 of [the 1834 Compact] seems to indicate clearly that New York has jurisdiction over Ellis Island." N. J. Exh. 52. The union local and Norton protested this decision, arguing that Solicitor Wyzanski was correct and calling attention to New Jersey's 1933 permit to the United States for work on the Island's seawall, as well as the 1904 deed from New Jersey to the United States conveying title to the submerged lands. The Procurement Division, again erroneously citing Article Second of the Compact, refused to budge.

The record does not reveal whether the Compact was ever brought to the notice of the Department of Labor, but if it was it made an impression markedly different from its effect on the Treasury. For in the 1940's, the Secretary of Labor moved from its solicitor's rejection of both States' claims to an acceptance of New Jersey's, issuing several decisions in the 1947–1949 period on proper wage rates for construction projects on the Island, to which he referred as "Ellis Island, New York Harbor, Hudson County, New Jersey." In the same period, the Department of Labor expressly ruled that New York building trade wage rates were not applicable to construction on the Island because "Ellis Island [is in] New York Harbor, in Hudson County, New Jersey." In June 1949, the Secretary declared that once again New York wage rates would apply; the Secretary explained only that "additional data and more current information have been assembled."

At the end of the day, or the possible prescription period, the circumstantial evidence of official federal views of Island sovereignty shows no consistent understanding, but simply a grab bag of opinions shifting back and forth between, and within, the agencies of the Government.

5

After reviewing all the evidence New York has presented, we find that with the arguable exception of maintenance of

some voting lists, New York has shown nothing more than a modest number of sporadic acts that might be regarded as prescriptive. Even the compilations of voting lists from time to time shared the characteristic of New York's other official acts in occurring off the Island, being either equivocal in their territorial references or ill calculated to give notice to New Jersey. Surely it is highly significant that the acts claimed as prescription by New York did not leave officials of the Island's actual occupants, the United States, with a settled or consistent understanding that the filled land might be subject to the sovereignty of New York.

## C

New York also asserts the affirmative defense of laches, which "'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Kansas* v. *Colorado,* 514 U. S. 673, 687 (1995) (quoting *Costello* v. *United States,* 365 U. S. 265, 282 (1961)). It presses this defense in spite of our explanation in *Illinois* v. *Kentucky,* 500 U. S., at 388, that "[a]lthough the law governing interstate boundary disputes takes account of the broad policy disfavoring the untimely assertion of rights that underlies the defense of laches and statutes of limitations, it does so through the doctrine of prescription and acquiescence." New York seemingly hopes to benefit from the possibility recognized in *Kansas* v. *Colorado, supra,* at 687–688, that a laches defense may be available in some cases founded upon interstate compacts. We have no reason to explore that possibility here, however, because New York has made it plain that what it calls the defense of laches is not at all what it really asserts.

The claim of prejudice that New York raises under the guise of a laches defense includes no prejudice in defending against suit insofar as it is based upon the Compact and the doctrine of avulsion. New York does not, for example,

argue that evidence going to the meaning of the Compact's terms has been lost as a result of delay by New Jersey. Indeed, several of New York's *amici* have proffered extensive material bearing on those terms (though to no avail as explained in footnote 3, *supra*), and the State itself has relied upon historical records of littoral filling practices in the Compact period, without suggesting that delay by New Jersey contributed to the loss of any such evidence.

New York claims prejudice, rather, in presenting its affirmative defense of prescription and acquiescence. To establish that defense, as we have seen, New York must prove that it took action to acquire sovereignty independent of the Compact, and that New Jersey failed to protest. When New York thus asserts prescription as an affirmative defense, it is in the same position it would have occupied if it had itself brought an original action against New Jersey claiming sovereignty by prescription. On each of the essential elements of prescription and acquiescence New York has the burden of persuasion, and therefore, though raising a "defense," it is in effect a plaintiff. And it is in aid of this plaintiff's burden of proof that New York claims to have been prejudiced: it argues that if this action had been brought many years ago there would have been more evidence of sovereign acts by its officials, and better evidence of general understanding of where sovereignty lay, to enable it to carry its burden.

New York may be right, as a matter of fact, though it is hard to say. But even if the State is right, it cannot benefit from the defense of laches. This is so because New York is effectively a plaintiff on the issue of prescription and cannot invoke laches to escape the necessity of proving its affirmative case.

### III

New Jersey's first and second exceptions go only to the dimensions of the original portion of the Island, the first questioning the Special Master's choice of water levels to

define the shoreline, the second challenging a miniscule detail of that line. Its third exception questions the authority to improve upon that line, once located.

## A

As the Special Master saw it, under Article Second, which awarded the Island to New York without further geographical specification, that State's authority extends to the original Island's low-water mark, a conclusion with which we agree, though not for the same reasons that persuaded the Special Master. He relied heavily on the negotiations between New Jersey and New York in 1827, in which New Jersey at one point offered to give New York "the islands called Bedlow's Island, Ellis' Island, Oyster Island and Robbins Reef, to [the] low water mark of the same . . . ." N. J. Exhs. 280–292 (Report of the Commissioners of New York to the New York Legislature, Jan. 26, 1828, p. 3). We rest our own, like conclusion (given the silence of the Compact) on the general rule we have previously recognized, that the low-water mark is the most appropriate boundary between sovereigns. See *Vermont* v. *New Hampshire*, 289 U. S., at 606; *Handly's Lessee* v. *Anthony*, 5 Wheat., at 383. We explained this in *Handly's Lessee:*

> "This rule has been established by the common consent of mankind. It is founded on common convenience. Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side, which was left bare by the receding of the water. . . . Wherever the river is a boundary between States, it is the main, the permanent river, which constitutes the boundary; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low-water mark." *Id.,* at 380–381.

We assume that the parties to the Compact were well aware of our precedent and would have explicitly provided for a high-water mark boundary if that is what they intended.

Nor is our assumption unsettled by the fact, emphasized by New Jersey, that Article Third gives New York jurisdiction over "lands covered by the . . . waters [of the rivers and the Harbor] to the low-water mark on the westerly or New Jersey side thereof [subject to certain exceptions]." New Jersey argues that specification of a low-water mark as a jurisdictional boundary on the New Jersey shore suggests that some other, or high-water, line was intended elsewhere, as on Ellis Island. But we think any such inference would be unsound.

The jurisdiction bounded at the low-water mark under Article Third was New York's jurisdiction over the waters of the river and harbor. New York was also given jurisdiction over the land submerged by this water. Since jurisdiction over the submerged land followed from jurisdiction over the water, one might question whether the submerged land jurisdiction crept inland at high water. On the assumption that title to fast land generally extended to mean low water, the answer to this question was wholly academic so far as it related to Ellis Island and the other islands, but of potential consequence so far as it concerned the New Jersey shore. If New York's jurisdiction over submerged lands moved inland on Ellis Island with rising water, it would simply extend over land already subject to New York's jurisdiction under the general rule recognized in *Handly's Lessee*, since New York had jurisdiction over the original Island. But that would not be so on the New Jersey shore. If New Jersey's sovereignty extended to mean low water under the general rule, there would be a conflict with New York's jurisdiction over submerged lands on the margin covered by high water. The specification that New York's submerged land jurisdiction would stop at the low-water mark on the New Jersey shore thus resolved a question that would only arise at that

westerly shore, and the fact that the Compact so provides raises no implication that anything but the general rule of sovereignty to mean low water was intended with respect to any shoreline. The provision in question, indeed, confirms the intent of the compacting parties to follow the general, low-water mark rule.

## B

New Jersey's second exception takes us to much narrower detail. The State challenges the sufficiency of the evidence for the Special Master's conclusion that the pier extending from the Island in 1834 was built on landfill, with the result that the area covered by it was meant to fall within New York's authority recognized in Article Second. The Special Master relied on a map of the Island from 1819, which appears to show a filled area around the location of the pier, and although New Jersey is correct that "it is possible that the pier was built on pilings," New Jersey Exceptions 47, New York's expert credibly testified that in the mid-1800's the use of pilings to create piers was still uncommon, and that it would have been much easier to add landfill to the shallow waters around the Island. We have to agree with the Special Master that the likely conclusion is that the pier was built on landfill.

## C

Finally, New Jersey argues that this Court lacks the authority to adjust the boundary between the States in the manner that the Special Master recommended for reasons of practicality and convenience, and with this we agree. The Compact Clause, Art. I, § 10, cl. 3, provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State . . . ." As we explained long ago, once a compact between States has been approved, "it settles the line or original right; it is the law of the case binding on the states and its citizens, as fully as if it had been never contested." *Rhode Island* v. *Massachu-*

*setts*, 12 Pet. 657, 727 (1838).   Indeed, congressional consent "transforms an interstate compact within [the Compact] Clause into a law of the United States," *Cuyler* v. *Adams*, 449 U. S. 433, 438 (1981); accord, *Texas* v. *New Mexico*, 462 U. S. 554, 564 (1983).   Just as if a court were addressing a federal statute, then, the "first and last order of business" of a court addressing an approved interstate compact "is interpreting the compact." *Id.*, at 567–568.   "[U]nless the compact to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms," *id.*, at 564, no matter what the equities of the circumstances might otherwise invite.   See *Arizona* v. *California*, 373 U. S. 546, 565–566 (1963) ("[C]ourts have no power to substitute their own notions of an 'equitable apportionment' for the apportionment chosen by Congress"); *Washington* v. *Oregon*, 211 U. S. 127, 135 (1908) (noting that Congress had established the boundary between Washington and Oregon in the middle of the north channel, and that "[t]he courts have no power to change the boundary thus prescribed and establish it at the middle of some other channel," even though changes in the waterway over the course of time seemed to indicate the equity of altering the boundary line); cf. *New Jersey* v. *Delaware*, 291 U. S. 361, 385 (1934); *Maryland* v. *West Virginia*, 217 U. S., at 46.

We appreciate the difficulties of a boundary line that divides not just an island but some of the buildings on it, but these drawbacks are the price of New Jersey's success in litigating under a compact whose fair construction calls for a line so definite.[27]   See *Texas* v. *New Mexico, supra*, at 567, n. 13 (noting that litigation of disputes between States "is obviously a poor alternative to negotiation between the interested States").   A more convenient boundary line must

---

[27] This is the reason that the contemporary inconvenience of the boundary is no threat to the plausibility of the evaluation of the prescription evidence by the Special Master and the Court, as JUSTICE STEVENS suggests.  See *post*, at 828–829.

therefore be "a matter for arrangement and settlement between the States themselves, with the consent of Congress." *Indiana* v. *Kentucky*, 136 U. S., at 508; see *Minnesota* v. *Wisconsin*, 252 U. S. 273, 283 (1920) ("It seems appropriate to repeat the suggestion . . . that the parties endeavor with consent of Congress to adjust their boundaries").

## IV

The exception of the State of New Jersey to Part VII of the Special Master's report, which concerns our authority to adjust the original boundary line between the two States, is sustained. The other exceptions of New Jersey and those of the State of New York are overruled. The case will be recommitted to the Special Master for preparation of a proposal for a decree consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring.

Many of us have parents or grandparents who landed as immigrants at "Ellis Island, New York." And when this case was argued, I assumed that history would bear out that Ellis Island was part and parcel of New York. But that is not what the record has revealed. Rather, it contains a set of facts, set forth with care by JUSTICE SOUTER and JUSTICE STEVENS (who do not disagree about the facts), which shows, in my view, that the filled portion of Ellis Island belongs to New Jersey.

I cannot agree with JUSTICE SCALIA that custom, assumption, and late 19th-century history fills in, and explains, an ambiguity in the original Compact between the States, for I do not find sufficient, relevant ambiguity. The word "relevant" is important, for the document, in fact, is highly ambiguous. But what I find the more serious and difficult ambiguity arises in sections upon which New York State does not

rely. See *ante,* at 773–775, 781–782, and nn. 3, 4 (discussing Article Third). The State has basically rested its case upon Article First and Article Second. See Brief for Defendant 11–15; Tr. of Oral Arg. 33, 35–36, 46. Those Articles specify that Ellis Island is in New Jersey waters, for the border between the States lies far to the east. Those Articles do mention an exception for New York's "present jurisdiction of and over Bedlow's and Ellis's islands," but they are silent about what would happen to an Ellis Island "avulsion," *i. e.,* the creation of significant additional territory through landfill. As JUSTICE SOUTER points out, *ante,* at 783, n. 6, silence is not ambiguity; silence means that ordinary background law applies; and that ordinary background law gives an island's avulsion not to the State that owns the island, but to the State in whose waters the avulsion is found. See *Georgia* v. *South Carolina,* 497 U. S. 376, 404 (1990); *Nebraska* v. *Iowa,* 143 U. S. 359, 361–362 (1892); see also *ante,* at 783–784.

Nor can I agree with JUSTICE STEVENS that New Jersey lost through prescription what once rightfully was its own. Too much of the evidence upon which he relies is evidence of events that took place during the time that neither New York nor New Jersey, but the Federal Government, controlled Ellis Island. At that time, Judge Wyzanski expressed the view that:

> "Ellis Island and Bedloe's Island are no more a part of New York or New Jersey than the Philippine Islands or Hawaii are. They are territories of the United States not falling under the jurisdiction of any one of the forty-eight states." N. J. Exh. 43.

The Federal Government's virtually exclusive authority over the Island means that New Jersey could well have thought about the same. Perhaps more specialized property lawyers would have phrased their own conclusions in less ringing terms and with more numerous qualifications. But, still,

one cannot reasonably expect New Jersey to have mounted a major protest against *New York's* assertions of "sovereignty" (modest as they were) over territory that was within the control of the Federal Government. Nor can one expect the immigrants themselves to have taken a particular interest in state boundaries, for most would have thought not in terms of "New York" or "New Jersey," but of a New World that offered them opportunities denied them by the Old. Given this background, any legal rule of "prescription" that found New York to have surmounted its high barrier here would create serious problems of fairness in other cases.

For these reasons, in particular, and others, all spelled out in detail by JUSTICE SOUTER, I must conclude that the filled portion of Ellis Island belongs not to New York, but to New Jersey. I therefore join the Court's opinion.

JUSTICE STEVENS, dissenting.

While I agree with the Court's analysis of the relevant legal issues, I do not agree with its appraisal of the evidence. Because we are in effect sitting as a trial court, and because the relevant evidence is either documentary or uncontradicted oral testimony, we are able to make our own findings of fact and draw appropriate inferences from those findings. In my judgment a preponderance of that evidence supports a finding that all interested parties shared the belief that the filled portions, as well as the original three acres, of Ellis Island were a part of the State of New York for over 60 years. That finding, in turn, supports the conclusion that New York acquired the power to govern the entire Island by prescription.

During the period between 1892 and 1954 Ellis Island served as the Gateway to America for over 12 million immigrants. Thousands of citizens worked on the Island and hundreds resided there during those six decades. There is no evidence that any of those people ever believed that any

part of Ellis Island was in the State of New Jersey. What evidence is available uniformly supports the proposition that whenever a question of state authority was considered by any members of that multitude of immigrants and citizens, both they and the responsible authorities in New York assumed that all of Ellis Island was a part of New York. The relevant facts were sufficiently public and obvious to support a presumption that, with one temporary exception, the authorities in New Jersey shared that belief. The fact that all of the relevant evidence concerning that period points in the same direction is far more significant than the fact that the quantity of evidence supporting certain propositions is not large. A solitary fingerprint may establish a preponderance of the evidence when there is a total absence of evidence pointing in another direction.

## I

As a preface to its factfinding, the Court provides us with two reasons for discounting the probative force of much of New York's evidence: the fact that New Jersey concedes that the original Island is in New York and the fact that the Island was occupied by the United States during the relevant period. *Ante,* at 790–794. Neither of those facts undermines the force of the uncontradicted evidence. I believe that a more appropriate preface to our factfinding function is a comment on the probable expectations of the three sovereigns who participated in the decision to enlarge the Island for use as an immigration station.

In 1890, when that decision was made, the 1834 Compact establishing the boundary between the two States had not yet been construed. Article Second of the Compact made it clear that Ellis Island was in New York, but Article Third identified separate interests in the area surrounding the Island. New Jersey was accorded "the exclusive right of property in and to the land under water" but New York was

accorded exclusive jurisdiction over those waters.[1]   In 1904, when New Jersey conveyed to the United States its entire "right, title, claim and interest of every kind" in those submerged lands, the parties may reasonably have believed that the State thereafter possessed neither ownership nor jurisdiction over that area, particularly since the Compact had provided that New York was entitled to exercise jurisdiction over the surrounding surface.

It is thus not surprising that during the entire period when the Island was enlarged, and when buildings were constructed on filled land, there appears to have been no discussion of the possibility that the Island might be located in two different States.   Indeed, even in 1955 and for several years thereafter when representatives of New Jersey vociferously asserted jurisdiction over Ellis Island, they claimed not just the filled portions but the entire Island.   It was not until 1963 that New Jersey first advanced the claim that the state line split the Island (and, consequently, three buildings on the Island).   Thus, the preponderance of the evidence supports a finding that during the relevant period between 1890 and 1954 both New Jersey and New York believed that the entire Island was located in one State.

## II

Census data collected by both New York and the Federal Government establish that nonimmigrants resided on Ellis Island throughout the relevant period.   This population increased from 93 in 1915, to 124 in 1920, and 182 in 1925.[2]

---

[1] Article Third also preserved New Jersey's jurisdiction "over the wharves, docks, and improvements, made and to be made on the shore of the said state," but that provision is not relevant because the original additions to Ellis Island were improvements to the shore of New York, not New Jersey.   4 Stat. 710.

[2] These figures refer to nonimmigrants.   The 1920 federal census stated that there also were 270 "patients" and 97 "immigrants" on the Island. The 1940 federal census stated that 717 people lived on the Island but does not indicate how many of them were nonimmigrants.   Since the 1940

The uncontradicted testimony indicates that these people lived only on the filled portion of the Island. They were employed as cooks, maids, nurses, and hospital attendants. Both the New York and federal censuses counted these people as residents of New York.

The evidence also indicates that these residents voted in New York elections. According to maps prepared by the New York City Board of Elections in 1918, 1926, 1927, 1930, and 1945–1946, Ellis Island was part of a New York State Assembly District. Moreover, both the 1894 and the 1938 New York State Constitutions place Ellis Island in a New York State Senate District. Furthermore, since 1911 New York law has explicitly included Ellis Island in a federal congressional district. Finally, records of the New York City Board of Elections for 1918, 1919, 1925,[3] 1930, and 1953 indicate that Ellis Island residents actually voted during those years. Indeed, an official list of enrolled voters for "1944–1945" identifies the party affiliation of over 50 residents of Ellis Island. It is reasonable to infer that residents of Ellis Island regularly voted in elections for New York offices and for candidates to represent New York in the United States Senate and House of Representatives. Given the public character of that activity it is also reasonable to infer that New Jersey was fully aware of that voting.

The Court fails to give proper weight to the fact that the entire population of the Island was counted as a part of New York in the federal census. The accuracy of the census is a matter of great importance to every State because it determines the size of a State's congressional delegation, as well as providing "the basis for the allocation of various benefits and burdens among the States under a variety of federal

---

total was roughly 50% greater than the 1920 total, the number of nonimmigrants may also have risen by a similar percentage.

[3] The 1925 records refer to 25 voters from Ellis Island, 14 of whom gave their addresses as on either Island No. 2 or Island No. 3, both of which are fill.

programs." *Franklin* v. *Massachusetts*, 505 U. S. 788, 814 (1992). Given the fact that a shift of only one or two hundred persons from one State to another might cause a State either to lose one of its seats in Congress or to fail to gain the number warranted by its relative increase in population, the accuracy of the census count is surely a matter of vital importance to the State.[4] The consistent treatment of Ellis Island residents as residents of New York in the federal census is a matter that must have come to the attention of New Jersey and which was clearly of sufficient importance to prompt a vigorous objection if responsible state officials believed that those residents really lived in New Jersey. The fact that the Island was under federal control does not minimize in the slightest the importance of the census figures, or the importance of the other public acts that authorized Ellis Island residents to vote in New York elections.

### III

There is uncontradicted testimony that between 1892 and 1954 there were hundreds of births and thousands of deaths on the Island. Since the hospital was located on the filled portions of the Island, virtually all of those births and deaths must have occurred in what is now claimed to be part of New Jersey. Presumably each of those births and each of those deaths was recorded in either a birth certificate or a death certificate. There is no evidence that any such certificate was issued by New Jersey. Given the fact that all of the relevant birth certificates and all of the relevant death certificates that have been found were issued by New York authorities, it is reasonable to infer that New York actually issued hundreds of birth certificates and thousands of death certificates to record events that occurred on Ellis Island. A preponderance of the evidence therefore would support a finding that throughout the relevant period New York per-

---

[4] See generally *Department of Commerce* v. *Montana*, 503 U. S. 442 (1992).

formed the governmental function of recording the births and deaths on Ellis Island, and that the families of those decedents and newborn infants thought that those events occurred in New York.

## IV

There is evidence that hundreds of marriages were performed on Ellis Island from 1892 to 1907. The exact number is uncertain, but it is undisputed that they were solemnized under New York law.[5] Moreover, after a 1907 amendment to New York's domestic relations law, Ellis Island residents obtained their marriage licenses at City Hall in New York City. Fiorello La Guardia, who served as an interpreter on the Island between 1907 and 1910, escorted couples to Manhattan so that they could get married. Presumably similar trips were made by engaged couples throughout the balance of the relevant period.[6] There is no evidence of any Ellis Island resident being married under New Jersey law.

---

[5] Although only a few marriage licenses are in the record, they are all New York licenses.

While there is some dispute over where these marriages occurred on the Island, it is fair to conclude, as the Court does, that these marriages were typically performed in the Great Hall of the Main Building, which was located on the original Island. Thus, they were performed in New York. The Court discounts the significance of this evidence because it does not necessarily constitute prescriptive activity on the filled portion of the Island. But if we assume, as the record plainly indicates, that everyone then believed that the entire Island was located in the same State, these marriages provide further confirmation of the proposition that everyone on the Island believed that that State was New York.

[6] One Ellis Island employee, who worked on the Island during the early part of the century, remembered as follows:

"'Very often brides came over to marry here, and of course we had to act as witnesses. I have no count, but I'm sure I must have helped at hundreds and hundreds of weddings of all nationalities and all types. The weddings were numberless, until they dropped the policy of marrying them at the Island and brought them to City Hall in New York.'" E. Corsi, In the Shadow of Liberty 87 (1969) (hereinafter Corsi).

## V

The evidence indicates that the millions of immigrants entering the country, as well as the hundreds of residents of the Island, believed that Ellis Island was located in New York. For many of the immigrants, their journey to America began with a steamship ticket with the destination listed as "New York." Upon arrival, the "certificate of arrival" for each newcomer was marked "Ellis Island, New York"; indeed, hundreds of thousands of such certificates of arrival are on file at the National Archives. Moreover, upon arrival, a federal official pinned a Landing Card on each newcomer; according to a representative card, the Landing Card stated, in eight different languages: "When landing at New York this card is to be pinned to the coat or dress of the passenger in a prominent position."[7] Given this evidence,

---

[7] One such Landing Card read as follows:

UNITED AMERICAN LINES
(INCORPORATED)

## LANDING CARD
(THIRD CLASS PASSENGERS)

Manifest Sheet No. 10

Name

*Lari Schauker*

List Number 6

When landing at New York this card to be pinned to the coat or dress of the passenger in a prominent position.

Bei Ankunft in Amerika muss diese Karte gut sichtbar an der Kleidung auf der Brust oder am Hut befestigt werden.

Kdyż cestující dorazí do přístavu v New Yorku, ať má tento lístek na viditelném místě na svých šatech připečněný

Keď cestujúci dorazí do prístavu v New Yorku, nech má tento lístok viditeľne pripevnený na svojich šatoch.

Podczas wyladowania w Nowym-Yorku passażerowie powinni przypiąć tą kartę do palta lub sukni na wydatnym miejscu.

Pri iskrcavanju u New Yorku ova se karta mora islofiti na istaknutom mjestu na kaputu ili haljini.

При высадке на берег в Нью-Йорке пассажиры должны приколоть эту карту на видном месте к пальто или платью.

[Yiddish text]

it is certainly fair to infer that the new immigrants believed that they had arrived in New York.

Similarly, residents of Ellis Island—all of whom lived on the filled portions of the Island—believed that they lived in New York. Documents executed by residents of the Island during the relevant period consistently referred to their address either as "Ellis Island, N. Y.," or as "Ellis Island, New York." These references appear not only in voting records, but in other miscellaneous documents as well. Given the fact that the United States Postal Service placed the Island in a New York postal zone, presumably the residents regularly received mail addressed to "Ellis Island, N. Y." There is no evidence that any of those residents prepared or received any mail or other documents describing their residence as in New Jersey.

Thus, the available evidence supports the proposition that the new immigrants, as well as everyone who lived on the Island during that period, thought that all of Ellis Island was a part of New York. Significantly, as far as I am aware, there is not a single indication in the voluminous record[8] that any immigrant or any resident thought that Ellis Island, in whole or in part, was a part of New Jersey.

## VI

On the few occasions identified in the record when it was necessary to obtain state or municipal assistance for law enforcement or fire protection on Ellis Island during the relevant period, those services were performed by New York employees. Thus, in the 1897 fire, "New York rushed twenty policemen to keep order among the panic-stricken immigrants."[9] In 1916, New York City firemen extinguished a fire in the seawall cribbing. In 1934, New York police investigated a fatality that resulted from a construc-

---

[8] The record contains over 2,000 documents (some of which are hundreds of pages long) and over 4,000 pages of trial testimony.

[9] Corsi 114.

tion accident on the Island. In 1942, the New York City Police Department formed a special squad to assist federal officials in questioning immigrants arriving at the Island. Thus, despite the fact that federal officials were in control of the Island, these incidents are consistent with the view that New York retained an interest in the Island, but New Jersey did not.[10]

## VII

When courts considered the question, they consistently assumed or decided that Ellis Island was a part of New York. Thus, in 1915 one New York state court assumed that it had jurisdiction over an action for assault allegedly committed on the Island.[11] In 1931, the United States Court of Appeals for the Third Circuit, which includes New Jersey, held that the District Court for the District of New Jersey did not have jurisdiction over a habeas corpus petition filed by an alien detained on the Island.[12] The federal judges sitting in

---

[10] The Master discounted this evidence by stating that there was evidence that New Jersey also policed the Island. Final Report of Special Master 114. The evidence cited, however, involved a single incident in 1966—over 10 years after the end of the relevant period. Tr. 3636–3637 (Aug. 8, 1996); see also 3 H. Unrau, Ellis Island, Statute of Liberty National Monument, New York-New Jersey 1173 (1984).

[11] Rettig v. John E. Moore Co., 90 Misc. 664, 154 N. Y. S. 124 (App. Term 1915).

[12] "The first contention is predicated on the assertion that Ellis Island is in the District of New Jersey and therefore within the jurisdiction of the District Court for that district.

"The island is property of the United States, ceded to the United States by the State of New York in 1808 and since 1891 used by the United States as an Immigration Station for the Port of New York. When it was property of New York it was within one or another of the counties of that state or within the waters thereof. With respect to federal jurisdiction over such counties and their waters, the United States by statute (28 U. S. C. § 178, Judicial Code, § 97) prescribed the territorial limits of the Southern District of New York and the Eastern District of New York as embracing certain counties 'with the waters thereof' and provided that the District Courts for the Southern and Eastern Districts 'shall have concurrent jurisdiction over the waters within the counties of New York, Kings, Queens, Nassau, Richmond, and Suffolk. * * *' This it would

the Southern District of New York exercised jurisdiction over cases arising out of the detention or deportation of aliens on Ellis Island. During the relevant period there is no evidence that any judge, state or federal, considered the possibility that Ellis Island might be in two States. Nor is there any evidence that any judge, state or federal, ever held that Ellis Island was a part of New Jersey.[13]

---

seem vested federal jurisdiction with respect to Ellis Island in the District Courts of the two named New York districts. But the relator, showing that by the Act of June 28, 1834 (4 Stat. 708) a boundary line between the states of New York and New Jersey had been run down the Hudson River to the sea, 'submitted' that Ellis Island is on the westerly or New Jersey side of the harbor and therefore is in—or 'not entirely' outside—the District of New Jersey and within at least 'the concurrent jurisdiction of the District Court for the District of New Jersey and the District Courts for the Eastern and Southern Districts of New York.' Jurisdiction is determined by statute, not by geography. The statute expressly, and therefore exclusively, placed federal jurisdiction of Ellis Island in the District Courts of the two named New York districts. The running of a boundary line in 1834 through the waters dividing the states of New York and New Jersey cannot disturb the statutory designation of jurisdiction in 1910.

"Therefore we hold that the judge of the District Court for the District of New Jersey had no power to issue the writ of habeas corpus prayed for in this case, to be executed outside of the territorial jurisdiction of his court." *United States ex rel. Belardi* v. *Day,* 50 F. 2d 816, 817 (CA3 1931).

[13] In a more recent case, the Court of Appeals for the Second Circuit reached the same conclusion as the Third:

"Ellis Island remains a part of New York by acknowledgment of the government and without objection (except in this case) by New Jersey. It has been a component of New York Congressional, State Senate and Assembly districts for more than one hundred fifty years. As part of New York County, it lies within the territorial jurisdiction of the United States District Court for the Southern District of New York, 28 U. S. C. § 112, and of New York's first judicial district, N. Y. Const. art. VI, § 6; see *Rettig* v. *John E. Moore Co.,* 90 Misc. 664, 154 N. Y. S. 124 (N. Y. App. Term 1915) (civil suit for assault committed 'upon government property at Ellis Island'). The government treats the entire area of Ellis Island as part of Manhattan for census purposes and has assigned a New York postal zip code to the Island. Those who have resided on Ellis Island, both before and after the Compact, have been treated as citizens of New York. In order to avoid liability in this case, the government asserts for the first time that certain portions of Ellis Island belong to New

## VIII

The Court discounts the probative force of most of New York's evidence by repeatedly reminding us that New York has the burden of proving prescription, and in many instances has failed to prove that New Jersey had actual notice of what happened on the Island, or, more narrowly, that the relevant events occurred on the filled portion rather than the original three acres. The discount would be appropriate if we were reviewing the history of a remote atoll in the far Pacific. In fact, Ellis Island was an enclave entirely within the geographic boundaries of New Jersey; a ferry connected it with Jersey City, which is less than a quarter of a mile away. Particularly during the first few decades of the prescriptive period, it teemed with activity that was open and notorious. Moreover, given the fact that 90% of the Island was filled land, it is surely reasonable to infer that whenever the specific location of a prescriptive event was in doubt, it is more likely than not that it occurred in what is now claimed to have been New Jersey.

Not only should we presume notice to New Jersey of what was occurring within the outer boundaries of the State; we must also presume that New Jersey was aware of the official acts of both New York and the United States that were predicated on the understanding that all of Ellis Island was in New York. Judicial districts, legislative districts, postal districts, and census districts all included the entire Island within New York.

## IX

The only significant evidence[14] offered by New Jersey to support the proposition that it did not accept New York's

---

Jersey. However, long acceptance of the status quo counts for a great deal in matters of territorial disputes between states." Collins v. Promark Products, Inc., 956 F. 2d 383, 387–388 (1992).

[14] There was also evidence that Hudson County, New Jersey, had placed Ellis Island on its tax roles. The county, however, did not ever attempt to collect taxes; because the Island was owned by the Federal Government, Ellis Island was marked as "exempt."

prescription of the entire Island relates to Representative Norton's efforts in 1934 and 1935 to persuade federal officials to use New Jersey labor in construction work on Ellis and Bedloe's Islands. In her letter of August 25, 1934, she advised the Division of Procurement of the Treasury Department that a local union in her home city contended[15] that "these islands are part and parcel of the State of New Jersey."[16] On March 19, 1935, she again advanced the position that Ellis Island was in New Jersey. When the Treasury Department ultimately rejected her submission, the matter appears to have been dropped.

Representative Norton's correspondence fails to establish nonacquiescence for several reasons. First, it demonstrates that people in New Jersey were actually aware of what was happening on Ellis Island. Second, when the Treasury Department ultimately rejected Representative Norton's sub-

---

[15] In a letter of July 31, 1934, the union wrote to Representative Norton:

"At the present time on Ellis Island there are under the course of erection several buildings and from maps obtained by us of the Department of Conservation and Development of the State of New Jersey, the latest edition of which was printed and revised in 1932 [sic] show specifically that this Island is entirely within the boundary lines of the State of New Jersey. This being the case we feel that Unions in New Jersey should have jurisdiction over this work and have protested to our International Union for the right to cover this operation." N. J. Exh. 18 (letter of Thomas F. Moore, Secretary, Bricklayers, Masons & Plasterers International Union, Local No. 10, New Jersey, to Honorable Mary T. Norton).

Similarly, on August 18, 1934, the union wrote to Representative Norton:

"Since the middle part of June this union has sought jurisdiction of those Islands lying in New York Bay, known as Ellis and Bedloes Islands, from the Executive Board of our International Union. It is our contention that these Islands are part and parcel of the State of New Jersey. We have also obtained official maps of the State of New Jersey . . . which shows [sic] that these Islands lie within the boundary lines of the State of New Jersey." N. J. Exh. 28 (letter of Thomas F. Moore, Secretary, Bricklayers, Masons & Plasterers International Union, Local No. 10, New Jersey, to Honorable Mary T. Norton).

[16] N. J. Exh. 29 (letter of Honorable Mary T. Norton, House of Representatives, to Division of Procurement, Treasury Department).

mission, she acquiesced in that rejection and the entire State joined in that acquiescence for another 20 years. Finally, the fact that her correspondence espoused the manifestly untenable position that the entire Island belonged to New Jersey makes it rather clear that she was not advancing a serious claim on behalf of the State.[17]

---

[17] The Court points to a few incidents when federal officials equivocated over whether Ellis Island belonged to New York or New Jersey. *Ante,* at 801–805. These incidents do *not, of course,* speak to New Jersey's non-acquiescence; nonetheless, they are relevant to New York's claims of prescription. None of these incidents, however, is significant.

First, maps from the Harbor Line Board from 1890 to 1911 labeled Ellis Island as being part of New Jersey. Yet since only the original Island existed in 1890, the first mapmaker obviously made a mistake; given the fact that the state designation had no practical consequence, it is reasonable to conclude that the mistake was simply carried forward in subsequent maps. Second, the Federal Government purchased the underwater land surrounding the Island from New Jersey in 1904; but because the 1834 Compact gave New Jersey property rights to such land, it is fair to assume that the Federal Government merely saw itself as purchasing this property from its rightful owner. Third, Edward Corsi, the Commissioner of Immigration on Ellis Island, applied to New Jersey's Board of Commerce and Navigation for permission to construct a new seawall in 1933. One of the blanks on the permit application asked "[w]here work is contemplated"; Corsi entered "New York." N. J. Exh. 10. So while it is unclear why Corsi applied to New Jersey for the permit, it is clear from the face of the document that Corsi believed the work was being performed in New York. Fourth, after Representative Norton argued that some of the jobs on Ellis Island should be given to New Jersey residents, federal officials initially proposed a compromise solution, dividing the jobs between New Jersey and New York; as noted, however, the officials eventually concluded that all of Ellis Island belonged to New York. Finally, from 1947 to 1949, the Department of Labor used New Jersey wage rates to determine wages for construction projects on the Island; in 1949, however, the Secretary reversed his decision—because "additional data and more current information ha[d] been assembled." N. J. Exh. 90.

These five incidents do not undermine New York's claim of prescription. Moreover, these isolated incidents are dwarfed by the Federal Government's repeated statements and actions that treated all of Ellis Island as a part of New York. The Immigration Service, the federal agency most intimately involved with the Island, clearly believed that all of Ellis Island

## X

JUSTICE BREYER's concurrence merits a separate comment. He places great reliance on Charles Wyzanski's statement that Ellis Island was not a part of either New Jersey or New York during the prescriptive period, but rather was a territory of the United States not falling within the jurisdiction of any of the then 48 States. See *ante,* at 813. Wyzanski, who was then the Solicitor of Labor, made this statement during the Federal Government's consideration of Representative Norton's request. As already noted, after full consideration, the Government rejected her request.

It is true that Wyzanski was an exceptionally able lawyer, but it is perfectly clear that in this instance he was simply wrong. Like numerous other federal enclaves within the United States, Ellis Island was unquestionably subject to the jurisdiction of the State or States in which it was located. Nevertheless, even though Wyzanski was clearly wrong, I would agree with JUSTICE BREYER that Wyzanski's opinion would be relevant if it stated a view that was expressed by others during the prescriptive period. In fact, there is not a shred of evidence that anyone else shared that view, either before or after Wyzanski made the statement. The prevailing view during the relevant period was that shared by the legislators who drew the boundaries of the congressional districts, the census takers who treated Ellis Island residents as citizens of New York, and the New York officials who supervised their voting in New York and recorded the births, marriages, and deaths that occurred on the Island. Indeed,

---

was part of New York, as is evidenced by dozens and dozens of documents in the record. Similarly, the Department of Public Health, the Navy Department, the Department of Treasury, and the Justice Department all repeatedly treated Ellis Island as a part of New York. (Although my analysis does not turn on this point, it is worth noting that many of these documents specifically refer to the filled portions of the Island.) In addition, as far as I am aware, every Act of Congress that mentioned the location of Ellis Island gave its location as New York.

one may infer from JUSTICE BREYER's opinion that his grandparents shared that view as well.

## XI

In my opinion the conclusion that New York acquired jurisdiction over the entire Island by prescription is supported not merely by a preponderance, but by clear, convincing, and uncontradicted evidence.[18]   With all respect, I am persuaded that the Court's contrary conclusion rests on a hypertechnical focus on detail that overlooks the significance of the record as a whole.   What I believe was apparent to virtually everyone in New York and New Jersey, as well as to the millions of immigrants who entered our melting pot through the Ellis Island Gateway during the early part of this century, is somehow obscured in a voluminous trial record.   The implausibility of the Court's conclusion is underscored by the strange boundary line that it has decreed.

Instead of the entire Island constituting an enclave within the borders of New Jersey, now New York's share of the Island is an enclave within New Jersey's share of the Island. The new state line intersects three buildings—the Main Building, the Baggage and Dormitory Building, and the Boathouse Building.   Thin strips of New Jersey's sovereign territory separate New York from the ferry slip where boats operated by the City of New York have been delivering millions of visitors annually.   By ending New York's sovereignty over a large portion of the ferry slip in front of the Main Building, well short of the slip's seawall, the decree denies New York access to, and control over, the area of land most intimately and functionally connected to the operation

---

[18] Because I think it clear that New York has acquired the power to govern the entire Island by prescription, it is not necessary for me to comment on the eminently sensible approach set forth by JUSTICE SCALIA, *post*, p. 829.

of the Main Building.   The Master correctly stated that this result is "neither just nor fair to New York."[19]

In my opinion it is not only the bizarre boundary that is unfair to New York.   It is the failure to draw the common-sense inference that neither State could have contemplated such a bizarre division of the Island during the prescriptive period that lasted for over 60 years.   During that entire period both States most certainly treated Ellis Island as part of a single State.   Unquestionably, that State was New York.

Accordingly, I respectfully dissent.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

I agree with JUSTICE STEVENS that the available evidence supports the conclusion that "all interested parties shared the belief that the filled portions, as well as the original three acres, of Ellis Island were a part of the State of New York for over 60 years," *ante*, at 814 (dissenting opinion).   And I agree that New Jersey's claim to the filled portions should be rejected for that reason.

I would not, however, rely upon prescription.   Since that doctrine permits a claimant to oust the original, undoubted owner, it justifiably demands a very high burden of proof. Specifically, and in the context of the present case, it requires, as the Court points out, not merely acts of possession and jurisdiction on the part of New York, but also, on the part of New Jersey, "acquiescence in those acts of possession and jurisdiction," which in turn requires "knowledge that New York acted upon a claim to the added land, or evidence of such open, notorious, visible, and uninterrupted adverse acts that New Jersey's knowledge and acquiescence may be presumed." *Ante*, at 787.

I see no reason to climb that mountain in the present case. New Jersey is *not* the original, undoubted owner whose title

---

[19] Final Report of Special Master 163.

could have been eliminated only by prescription. The status of Ellis Island is governed by a contract between New York and New Jersey—the Compact of 1834—that is, on this point, poorly drafted and ambiguous:* It is hornbook contracts

---

*JUSTICE BREYER asserts that there is no "sufficient, relevant ambiguity" because New York has "basically rested its case upon Article First and Article Second" of the Compact, which "are silent about what would happen to an Ellis Island 'avulsion,'" leading JUSTICE BREYER to the conclusion that the normal rules of avulsion apply. *Ante*, at 812, 813 (concurring opinion). It is true that the State of New York did not claim title through Article Third, but it relied heavily upon Article Third in giving meaning to Articles First and Second—as we must do as well, since the Compact was meant to form an integrated whole. JUSTICE BREYER contends that Articles First and Second "specify that Ellis Island is in New Jersey waters, for the [Article First] border between the States lies far to the east." *Ante*, at 813. But Article First establishes a boundary down the middle of the Hudson only "except as hereinafter otherwise particularly mentioned." The exceptions include (in Article Second) New York's jurisdiction over Ellis Island, and its "exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that state." New York's claim that the normal rules of avulsion were not meant to apply to this exception rests largely upon its contention that one of the major purposes of the Compact was to "guarante[e] New York's control over commerce and navigation in New York Harbor," which was achieved (1) by Article Second's giving New York "exclusive jurisdiction" over all the islands in the bay, and (2) *by Article Third's* giving New York "exclusive jurisdiction" (the same language) over all the waters and submerged lands of the bay. Exceptions of State of New York to Report of Special Master 16. This major purpose, according to New York, would be defeated if landfill additions to the islands on the New Jersey side of the bay became little enclaves of New Jersey. It is therefore not true that New York did not rest its argument upon Article Third—and not true (when one reads the Compact as a whole) that Article Second unambiguously leaves the question of landfill on Ellis Island to the background law of avulsion.

I may add that even if Article Third were totally unconnected to Articles First and Second, I do not think in a matter of this consequence we should hear only the arguments of the State of New York, and disregard those of New York City, which has a vital interest in this matter and participated actively as an *amicus*, in submitting evidence, examining wit-

law that the practical construction of an ambiguous agreement revealed by later conduct of the parties is good indication of its meaning. See, *e. g.,* 17A Am. Jur. 2d, Contracts § 357 (1991); Restatement (Second) of Contracts §§ 202(4), 203 (1979); Uniform Commercial Code § 2–208(1), 1 U. L. A. 407 (1989).

We have applied that principle before to treaty cases (the Compact here is of course a treaty). See, *e. g., Air France* v. *Saks,* 470 U. S. 392, 396 (1985) (" '[T]o ascertain [the] meaning [of treaties] we may look beyond the written words to . . . the practical construction adopted by the parties' ") (quoting *Choctaw Nation* v. *United States,* 318 U. S. 423, 431–432 (1943)). We have also applied similar reasoning to the precise area of interstate boundary disputes. See *Vermont* v. *New Hampshire,* 289 U. S. 593, 619 (1933) ("[T]he practical construction of the boundary by the acts of the two states and of their inhabitants tends to support our interpretation of the Order-in-Council of 1764"). I would do so again here.

For a lengthy period of time all the parties to the Compact—New York, New Jersey, and the United States—behaved as though all of Ellis Island belonged to New York. New York provided to the residents of the Island, including the filled portions, privileges and services a sovereign normally provides—the right to vote, civil marriages, birth and death certificates, police and fire protection. As far as appears, New Jersey provided none of them; and whether or not New Jersey knew that New York was behaving like a sovereign, it assuredly knew that *it* was *not.* And the United States, for its part, treated the Island as part of New York for its governmental purposes, including the constitutionally required decennial census, the assignment of postal

nesses, and presenting argument. The city *did* rely upon Article Third as an independent basis for New York's jurisdiction. It seems to me that JUSTICE BREYER and the Court bend over backward to pronounce clarity in this document where there is none.

zones, and (in the end) application of the Davis-Bacon Act, 46 Stat. 1494. That practical construction suffices, in my view, to establish what the Compact of 1834 meant.